# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA, ) ) ) Plaintiff/Counterclaim Defendant, ) ) v. ) ) GENE L. MUSE, M.D., ) ) Defendant/Counterclaimant; ) ) and ) ) PATIA PEARSON, ) ) Defendant. ) | No. CIV-17-1361-G |

## ORDER

Now before the Court is the Motion for Partial Judgment on the Pleadings (Doc. No. 96) filed by Defendant/Counterclaimant Gene L. Muse, MD ("Defendant Muse"). Plaintiff/Counterclaim Defendant Allianz Life Insurance Company of North America ("Plaintiff" or "Allianz") has filed a Response (Doc. No. 110), to which Defendant Muse has replied (Doc. No. 119).

I.    BACKGROUND

In December 2017, Plaintiff filed its Complaint (Doc. No. 1) alleging that a dispute has arisen in connection with a long-term-care insurance policy (the "Policy") issued in 2000 by Plaintiff to Defendant Muse. *See* Compl. ¶¶ 11-41; *id.* Ex. 1 (Doc. No. 1-1). The Policy provides Home and Community Services benefits, which include payment for Home Care ("HC") services provided in connection with specified activities of daily living

("ADLs"). To be eligible for such HC payments, the insured must be certified within the previous 12 months by a licensed health care practitioner as being Chronically Ill—that is, (1) being unable to perform, without Substantial Assistance, at least two ADLs for a period of at least 90 days due to loss of functional capacity or (2) having a severe "Cognitive Impairment." Compl. ¶¶ 12-14; *id.* Ex. 1, at 11, 13.

Defendant Muse filed his first claim for HC payments on or about July 28, 2015, asserting that he had been paying for home care for "all daily activities" from Adlife HomeCare LLC ("Adlife") since September 17, 2014. Compl. ¶ 17. In September 2015, a physician certified that Defendant Muse needed continuous assistance with ADLs. *Id.* ¶ 18. Defendant Muse shortly thereafter submitted invoices stating that Defendant Patia Pearson with Adlife had provided Defendant Muse with daily HC services from July 1, 2015, through September 25, 2015. *Id.* ¶¶ 19-20. On or about November 2, 2015, Plaintiff paid the claim for HC payments for July 1, 2015, to September 25, 2015. *Id.* ¶ 21.

In September 2015 and again in November 2015, Plaintiff retained an investigator to record video surveillance of Defendant Muse, allowing Plaintiff "to compare [Defendant Muse's] self-reported functional limitations with his functional abilities exhibited on tape." *Id.* ¶¶ 18, 22. Plaintiff alleges that on both occasions the video reflected Defendant Muse "engaging in activities inconsistent with his asserted limitations." *Id.* On or about January 15, 2016, Plaintiff informed Defendant Muse that based upon its review of information submitted and the surveillance video, Plaintiff was going to pay the claims for HC payments through November 22, 2015, but that Defendant Muse's claims for services rendered after that date were denied. *Id.* ¶ 23.

Defendant Muse then appealed the claim denial. *Id.* ¶ 24. Plaintiff arranged an in-home nursing assessment, which was conducted on or about July 20, 2016. *Id.* ¶ 25. On or about August 18, 2016, Plaintiff upheld the denial of benefits for service dates after November 22, 2015. *Id.* ¶ 26.

Defendant Muse appealed this decision through his attorney, submitting additional materials for review. Included in these materials was a letter from one of Defendant Muse's treating physicians, which did not state an opinion regarding Defendant Muse's ability to perform ADLs. *Id.* On January 30, 2017, Plaintiff requested that this physician "provide a Chronically Ill Statement expressing his opinion on Muse's ability to perform [ADLs]." *Id.* On or about March 3, 2017, Plaintiff notified Defendant Muse that it had reconsidered and would pay the claims submitted for HC services rendered from November 23, 2015, through January 1, 2016. *Id.* ¶ 28.

On March 18, 2017, an investigator hired by Plaintiff recorded video surveillance of Defendant Muse engaging in physical activities "inconsistent with his asserted limitations." *Id.* ¶ 29. Defendant Muse continued to submit claims with invoices and documentation logs showing HC services provided by Defendant Pearson during 2016 and 2017. *Id.* ¶¶ 30 (Jan. 2, 2016—Apr. 1, 2016), 31 (Apr. 2, 2016—July 31, 2016), 33 (Aug. 1, 2016—Feb. 3, 2017). On May 3, 2017, Plaintiff authorized payment of claims for services provided from August 1, 2016, through February 3, 2017. *Id.* ¶ 33.[1]

On or about May 5, 2017, Defendant Muse's treating physician issued the

---

[1] It appears but is not directly alleged that Plaintiff also authorized payment for the invoices for HC services performed from January 2, 2016, through July 31, 2016. *See* Compl. ¶¶ 30, 31, 33.

Chronically Ill Statement that had been requested by Plaintiff on January 30, 2017, opining that he found Defendant Muse able to perform certain ADLs and that he did not know whether Plaintiff could independently perform the remaining identified ADLs. *Id.* ¶ 34. Thus, the treating physician's Statement did not certify that Defendant Muse was Chronically Ill.

On or about June 29, 2017, Plaintiff informed Defendant Muse it would not approve benefits beyond April 22, 2017, based upon the treating physician's Statement. After Defendant Muse submitted invoices for payment of claims beyond that date, Stephen K. Holland, MD, completed a review of medical records and the video recordings. *Id.* ¶¶ 36-39. Dr. Holland issued a report on November 10, 2017, stating that he was not able to certify Defendant Muse as a Chronically Ill individual under the Policy. Dr. Holland also opined that Defendant Muse had regained his ability to perform ADLs no later than September 21, 2016. *Id.* ¶ 40.

In December 2017, Plaintiff filed this lawsuit, raising claims of: (i) declaratory relief, seeking a judicial determination that Defendant Muse is "not entitled to additional Policy benefits for services provided from April 22, 2017 to the present"; (ii) fraud and deceit against both Defendants; and (iii) conspiracy to defraud and deceive against both Defendants. *Id.* ¶¶ 42-57. Defendant Muse has raised four counterclaims against Plaintiff: (i) breach of contract; (ii) breach of the duty of good faith and fair dealing; (iii) fraud/misrepresentation/deceit; and (iv) intentional infliction of emotional distress. Def. Muse Answer & Countercls. ¶¶ 135-152 (Doc. No. 9).

II.   STANDARD OF REVIEW

Rule 12(c) of the Federal Rules of Civil Procedure permits a party to move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). The Court evaluates the motion under the familiar standard applied to Rule 12(b)(6) motions. *See Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000) (citing *Mock v. T.G. & Y. Stores Co.*, 971 F.2d 522, 528 (10th Cir. 1992)). Accordingly, the Court "accept[s] all facts pleaded by the non-moving party as true and grant[s] all reasonable inferences from the pleadings in favor of the same." *Adams v. Jones*, 577 F. App'x 778, 782 (10th Cir. 2014) (internal quotation marks omitted). "[T]o survive judgment on the pleadings, [the plaintiff] must allege 'a claim to relief that is plausible on its face.'" *Sanchez v. U.S. Dep't of Energy*, 870 F.3d 1185, 1199 (10th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "To determine whether the claim to relief is 'plausible on its face,' we examine the elements of the particular claim and review whether the plaintiff has pleaded factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotation marks omitted) (noting that the court does not "accept mere labels and legal conclusions as true").

III.   DISCUSSION

In his Motion, Defendant Muse seeks judgment on Plaintiff's claim for declaratory relief. More precisely, Defendant Muse argues that this Court should employ the discretion provided to it under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), and decline to exercise jurisdiction over this claim. In support, Defendant Muse cites *State Farm Fire &*

*Casualty Co. v. Mhoon*, where the Tenth Circuit explained, "The Supreme Court has long made clear that the Declaratory Judgment Act 'gave the federal courts competence to make a declaration of rights; it did not impose a duty to do so.'" *Mhoon*, 31 F.3d 979, 982 (10th Cir. 1994) (quoting *Pub. Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111, 112 (1962)). In deciding whether to hear a declaratory action, the district court should consider:

> [1] whether a declaratory action would settle the controversy; [2] whether it would serve a useful purpose in clarifying the legal relations at issue; [3] whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or to provide an arena for a race to *res judicata*; [4] whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and [5] whether there is an alternative remedy which is better or more effective.

*Id.* at 983 (internal quotation marks omitted).

Plaintiff responds that consideration of these factors supports this Court retaining its claim.[2] The Court agrees as discussed below.

*A. The First and Second Factors*

Regarding the first two factors, Defendant Muse argues that a declaratory judgment will not settle the parties' controversy or clarify the legal relations at issue because the video surveillance captured by Plaintiff's investigator does not prove as a matter of law that Defendant Muse cannot perform his ADLs without substantial assistance. Def.'s Mot. at 10-11, 14 (citing Compl. ¶ 22). But Plaintiff's declaratory-judgment claim is not based solely upon the alleged contents of the video recordings. *See* Compl. ¶ 42 (incorporating

---

[2] Citing Rule 12(b), Plaintiff also argues that the Motion is procedurally improper because Defendant Muse already has answered the Complaint. This argument is inconsistent with Rule 12(c)'s directive that "a party may move for judgment on the pleadings" "[a]fter *the pleadings* are closed." Fed. R. Civ. P. 12(c) (emphasis added); *see id.* R. 7(a).

6

factual allegations regarding physician statements and appeal determinations into the declaratory-judgment claim). Further, this point arguably supports the denial of entry of judgment at this stage, by pointing to a factual dispute that potentially will arise when evidence outside the pleadings can be considered. For purposes of this Rule 12(c) motion, the Court must "accept all facts pleaded by [Plaintiff] as true and grant all reasonable inferences from the pleadings in favor of the same." *Adams*, 577 F. App'x at 782 (internal quotation marks omitted).

Defendant Muse also argues that Plaintiff's declaratory-judgment claim is seeking "adjudication by declaration of something that will flow necessarily from the adjudication of the merits of Plaintiff's other claims and resolution of Defendant Muse's counterclaims." Def.'s Mot. at 11-12 (citing *Essex Ins. Co. v. Johnson's Wrecker & Salvage, Inc.*, No. CIV-12-1312-F, 2013 WL 12370718 (W.D. Okla. June 28, 2013); *Dixie Gas & Food, Inc. v. Shell Oil Co.*, No. 03-C-8210, 2005 WL 1273273 (N.D. Ill. May 25, 2005); *Amari v. Radio Spirits, Inc.*, 219 F. Supp. 2d 942 (N.D. Ill. 2002)). Defendant Muse, however, only generally discusses these "other claims" and counterclaims and does not provide sufficient detail to support the argument that these causes of action are essentially subject to common resolution together with the declaratory-judgment claim. Nor are Defendant Muse's cited district-court decisions helpful to his argument. In *Essex*, this Court dismissed the *insured's* declaratory-judgment counterclaims because they "mirror[ed]" the insurer's initial complaint. *Essex Ins. Co.*, 2013 WL 12370718, at *6. In *Dixie Gas & Food*, the court dismissed a claim for declaratory relief that was duplicative and "redundant" of the plaintiff's other claims. *Dixie Gas & Food*, 2005 WL 1273273, at *7. As mentioned

above, Defendant Muse has not sufficiently shown that Plaintiff's request for declaratory judgment of noncoverage after a certain date is no different in kind than a claim that Defendants engaged in fraud and deceit and in conspiracy to defraud and deceive. Finally, in *Amari*, the court dismissed a declaratory-judgment claim in an effort to "streamline" two separate federal-court actions pending in the same court and covering the same contract, rather than a claim raised in a single lawsuit as here. *Amari*, 219 F. Supp. 2d at 943-45.

These factors weigh in favor of the Court retaining Plaintiff's declaratory-judgment claim.

*B. The Third Factor*

Regarding the third factor, Defendant Muse argues that Plaintiff's timing of this lawsuit—i.e., allegedly filing suit after Defendant Muse's attorney "threatened to sue Allianz for bad faith"—constitutes "procedural fencing." Def.'s Mot. at 13. But Defendant Muse does not cite any allegation in the pleadings before the Court that Defendant Muse's attorney made such a threat shortly before the lawsuit was filed in December 2017. *See id.*; *see also* Compl. ¶¶ 27, 39-41 (relating communication between Plaintiff and Defendant Muse's attorney in January 2017); Def. Muse Answer & Countercls. ¶ 131 (alleging that on November 8, 2017, Defendant Muse "requested an explanation" and "the complete claim file" but setting forth no allegation of a threatened lawsuit); *cf. Mosier v. Maynard*, 937 F.2d 1521, 1525 (10th Cir. 1991) (noting that factual statements made by counsel in briefing do not constitute summary-judgment evidence). Further, an allegation of timing alone does not show improper "fencing," particularly where there is no other pending litigation and thus no allegation that Plaintiff is attempting to "manipulate the courts." *W.*

8

*Am. Ins. Co. v. Atyani*, 338 F. Supp. 3d 1227, 1233 (D.N.M. 2018). This factor weighs in Plaintiff's favor.

### C. The Fourth Factor

Here, the Court examines "whether a declaratory judgment in federal court would prevent the state court from determining the same issue or lead to friction between two conflicting resolutions of the same dispute." *Id.* As there is no other judicial action pending, the maintenance of this claim in this Court will not prevent or disrupt any other court's determination of these issues, and so this factor leans in favor of the exercise of jurisdiction.

### D. The Fifth Factor

The final factor examines "whether there is an alternative remedy which is better or more effective." *Mhoon*, 31 F.3d at 983 (internal quotation marks omitted). Again, Defendant Muse has not shown that resolution of whether the parties have engaged in the misdeeds alleged in Plaintiff's other claims or in Defendant Muse's counterclaims will conclusively determine the rights and obligations under the Policy beginning April 22, 2017. Defendant Muse does not point to any other "alternative remed[ies]." This factor likewise weighs in Plaintiff's favor.

IV. CONCLUSION

In sum, Plaintiff's reliance upon the Declaratory Judgment Act is a proper mechanism to clarify the rights and obligations of Plaintiff and Defendant Muse under the Policy and the insured's entitlement to benefits on and after April 22, 2017. *See State Farm Fire & Cas. Co. v. Telecomm Consultants, Inc.*, 757 F. App'x 726, 729-30 (10th Cir. 2018)

(affirming this Court's refusal to dismiss or stay an insurer's claim for declaratory judgment regarding its obligation to the insured); *Farmers All. Mut. Ins. Co. v. Jones*, 570 F.2d 1384, 1386 (10th Cir. 1978) ("Declaratory judgment actions are seen as useful in actions wherein insurance companies seek to have their liability declared. We have expressly recognized that one of the primary functions of the Act is to provide the insuror such a forum." (citation omitted)). Defendant Muse's Motion for Partial Judgment on the Pleadings (Doc. No. 96) is therefore DENIED.

IT IS SO ORDERED this 21st day of November, 2019.

CHARLES B. GOODWIN
United States District Judge