UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA, | ) ) ) | |
| Plaintiff/Counterclaim Defendant, | ) ) | |
| v. | ) ) | No. CIV-17-1361-G |
| GENE L. MUSE, M.D., | ) ) | |
| Defendant/Counterclaimant; | ) ) | |
| and | ) ) | |
| PATIA PEARSON, | ) ) | |
| Defendant. | ) | |

## ORDER

Now before the Court is the Motion for Partial Summary Judgment (Doc. No. 97) filed by Defendant/Counterclaimant Gene L. Muse, MD ("Muse") and Defendant Patia Pearson ("Pearson") (collectively, "Defendants"), seeking judgment on the fraud-and-deceit and conspiracy claims alleged by Plaintiff/Counterclaim Defendant Allianz Life Insurance Company of North America ("Allianz"). Allianz has filed a Response (Doc. No. 111), to which Defendants have replied (Doc. No. 120). For the reasons outlined below, Defendants' Motion is denied.

*I.     Standard of Review*

Summary judgment is a means of testing in advance of trial whether the available evidence would permit a reasonable jury to find in favor of the party asserting a claim. The

Court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A party that moves for summary judgment has the burden of showing that the undisputed material facts require judgment as a matter of law in its favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To defeat summary judgment, the nonmovant need not convince the Court that it will prevail at trial, but it must cite sufficient evidence admissible at trial to allow a reasonable jury to find in the nonmovant's favor—i.e., to show that there is a question of material fact that must be resolved by the jury. *See Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

> Parties may establish the existence or nonexistence of a material disputed fact by:
>
> - citing to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in the record; or
>
> - demonstrating "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1)(A), (B). While the Court views the evidence and the inferences drawn from the record in the light most favorable to the nonmoving party, *see Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be

insufficient; there must be evidence on which the [trier of fact] could reasonably find for the [nonmovant]." *Liberty Lobby*, 477 U.S. at 252.

II. *Relevant Facts*

In December 2017, Allianz filed its Complaint (Doc. No. 1) alleging that a dispute had arisen in connection with a long-term-care insurance policy ("the "Policy") issued in 2000 by Allianz to Muse. *See* Compl. ¶¶ 11-41; *id.* Ex. 1 ("Policy") (Doc. No. 1-1). The Policy provides "Daily Benefits" for "Home and Community Services," which include payment for "Home Care" services provided in connection with the activities of daily living—or ADLs—of bathing, continence, dressing, eating, toileting, and transferring. Policy at 10. To be eligible for such Daily Benefits, the insured must be certified within the previous 12 months by a licensed health care practitioner as being "Chronically Ill"—i.e., (1) being unable to perform, without "Substantial Assistance," at least two ADLs for a period of at least 90 days due to loss of functional capacity or (2) having a severe "Cognitive Impairment." *Id*. at 11, 13-14. "Substantial Assistance" means "hands-on or stand-by assistance of another person without which you would be unable to perform [ADLs]." *Id.* at 13.

The Policy provides Muse with unlimited Daily Benefits for Home and Community Services for the period that Muse is eligible. *See id.* at 5, 13-14. If eligible for payment of benefits, Muse receives the full Daily Benefit for covered services, "regardless of actual charges incurred" by Muse. *Id.* at 8. The Policy provides, however, that "[n]o benefits will be paid for any . . . care . . . or [services]" "for which [Muse] ha[s] no financial liability or that [are] provided at no charge in the absence of insurance." *Id.* at 16.

Muse, who previously worked as an orthopedic surgeon, alleges that he suffers from chronic physical ailments, as well as impairments that arose when he fell from a ladder on June 28, 2014. Def. Muse Answer & Countercls. ¶¶ 69-70. Muse filed his first claim for Daily Benefits on July 28, 2015, asserting that he had been paying for home health-care services for "[a]ll daily activities" from Adlife HomeCare LLC ("Adlife," later known as "Alpha Private Services LLC") since September 17, 2014. Defs.' Mot. Ex. 1 (Doc. No. 97-1); *see also* Compl. ¶ 17.

On or about September 17, 2015, Donald Adams, MD, examined Muse and certified that Muse needed continuous assistance with ADLs. Defs.' Mot. Ex. 2 (Doc. No. 97-2); *see also* Compl. ¶ 18. On September 16-18, 2015, Allianz retained an investigator to record video surveillance of Muse. Wuensch Dep. 162:1-11 (Apr. 10, 2019) (Patty Wuensch testifying in role as Allianz Principal Claims Consultant) (Doc. No. 97-36); *see also* Compl. ¶ 18. The investigator recorded Muse ambulating without assistance and driving a vehicle and also walking with the use of crutches when going to an appointment. *See* Video of Sept. 16-18, 2015 (Doc. No. 98-14 (conventionally filed)); *see also* Compl. ¶ 18.

On September 30, 2015, Muse submitted to Allianz: (1) a copy of Adlife's state license; (2) Adlife's care plan for Muse; and (3) itemized invoices and Weekly Documentation Logs from Adlife certifying under penalty of law that Pearson, who is a Home Health Aide with Adlife, had provided Muse with the identified home-health services every day from July 1, 2015, through September 25, 2015. Defs.' Mot. Ex. 12 (Doc. No. 97-12); Wuensch Dep. 35:5-36:1; *see also* Compl. ¶ 19 ("Muse submitted or caused the . . . Weekly Documentation Logs to be submitted to Allianz for the purpose of

securing payment of the [Daily Benefits] from Allianz under the Policy."); Muse Answer & Countercls. ¶ 19.

On October 26, 2015, a letter from Allianz's long-term-care benefits administrator, issued on Allianz letterhead, notified Muse that he was eligible for Daily Benefits based upon his Chronically Ill certification—i.e., the report from Dr. Adams regarding Muse's ADLs—and that Muse's "benefit eligibility period is approved through January 26, 2016 provided [Muse] continue[s] to satisfy the policy's benefit eligibility requirements." Defs.' Mot. Ex. 3 (Doc. No. 97-3). On November 9, 2015, Allianz paid the claim for Daily Benefits for $32,728.53 to Muse for dates of service from July 1, 2015, to September 25, 2015. Defs.' Mot. Ex. 26 (Doc. No. 97-26) at 2-4. On January 21, 2016, Allianz paid $22,232.84 for Daily Benefits for services rendered September 26, 2015, through November 22, 2015. *Id.* at 5-6.

On November 23-25, 2015, Allianz again retained an investigator to record video surveillance of Muse. Wuensch Dep. 207:15-18 (Doc. No. 97-36); *see also* Compl. ¶ 22. This surveillance reflected Muse ambulating without assistance, opening and closing a vehicle door, entering and exiting a vehicle, driving to and from a local bank, and walking into and out of the bank without any visible use of braces or crutches. *See* Video of Nov. 23-25, 2015 (Doc. No. 98-15 (conventionally filed)). The investigator also observed Pearson leaving Muse's residence at 9:45 a.m. on November 25, 2015, and not returning before 4:00 p.m. when the surveillance ended. *See id.*

On January 15, 2016, Allianz sent a letter to Muse informing him that "because the level of impairment" claimed by Muse—i.e., daily assistance with his ADLs and numerous

other tasks—"did not appear to be consistent with medical information," Allianz had conducted an "activities check," the results of which "conflict[ed] with the documented care needs described in the Weekly Documentation Logs." Defs.' Mot. Ex. 4 (Doc. No. 97-4). The letter then summarized the events recorded on the video of November 23-25, 2015, described above and concluded, "The activities we have observed suggest that Dr. Muse is capable of performing the Activities of Daily Living without Substantial Assistance of another person. Consequently, we have concluded that he is not Chronically Ill beginning on November 23, 2015, and no further benefits will be approved for services received on or after this date." *Id.*

Muse then appealed this claim denial, submitting a letter from Michael Winzenread, MD, asserting that Muse needed assistance with the ADLs of bathing, dressing, and toileting. Defs.' Mot. Ex. 5 (Doc. No. 97-5); *see also* Compl. ¶ 24. Allianz then advised Muse that it would be seeking medical records from Dr. Winzenread and requesting an in-home nursing assessment by a nurse care manager. Defs.' Mot. (Doc. No. 97-6). The in-home assessment was conducted on or about July 20, 2016. Comp. ¶ 25. Muse and Pearson both participated in the assessment and asserted that Muse required assistance from Pearson with bathing, continence, dressing, eating, toileting, and transferring. *Id.*; *see also* Muse Answer & Countercls. ¶ 25. When Pearson attempted to show how she assists Muse with showering, she appeared unfamiliar with the process and did not open the correct door. Video of July 20, 2016 (Doc. No. 98-17 (conventionally filed)); Wuensch Dep. 70:25-71:18 (Doc. No. 97-32). On August 18, 2016, Allianz upheld the denial of benefits for service dates after November 22, 2015. Defs.' Mot. Ex. 8 (Doc. No. 97-8).

Muse appealed this decision through his attorney, submitting additional materials for review on October 26, 2016. Defs.' Mot. Ex. 9 (Doc. No. 97-9). On March 3, 2017, Allianz notified Muse that it had reconsidered and would pay the claims submitted for Daily Benefits rendered from November 23, 2015, through January 1, 2016. Defs.' Mot. Ex. 10 (Doc. No. 97-10). On March 10, 2017, Allianz paid Daily Benefits of $15,800.00 to Muse for services provided him during that period. Defs.' Mot. Ex. 26, at 26-27.

On March 18, 2017, Allianz again hired an investigator to record video surveillance of Muse. Compl. ¶ 29; Defs.' Mot. at 20. Video taken at a fundraising event shows Muse: ambulating alone, without either stand-by or hands-on assistance from another person; carrying a cane, but not depending upon the cane, often shifting it from one hand to the other; fluidly moving around the room and navigating around long tables and chairs without any restriction or hesitation; pulling a credit card from his wallet, picking up a box approximately 10-12" square, and carrying it under his arm; picking up a chair by the upper back of the chair using one hand and lifting the chair above his shoulder then putting it down and sitting in it without difficulty; picking up forms; and grasping a pen and writing on the forms. Video of Mar. 18, 2017 (Doc. No. 98-16 (conventionally filed)). Pearson also appears in the video; her log from that day does not indicate that she attended this event with Muse. *Id.*; Defs.' Mot. Ex. 21 (Doc. No. 97-21) at 28-30.

Muse continued to submit claims with invoices and documentation logs showing home-health services provided by Pearson during 2016 and 2017. Defs.' Mot. Exs. 18 (Jan. 2, 2016—Apr. 1, 2016) (Doc. No. 97-18), 19 (Apr. 2, 2016—July 31, 2016) (Doc. No. 97-19), 20 (Aug. 1, 2016—Feb. 3, 2017) (Doc. No. 97-20). On April 19, 2017, Allianz

paid Daily Benefits of $83,740.00 to Muse for services provided him from January 2, 2016, through July 31, 2016. Defs.' Mot. Ex. 26, at 28-29. On May 5, 2017, Allianz paid $75,741.25 of Daily Benefits to Muse for services provided him from August 1, 2016, through February 3, 2017. *Id.* at 30-31. On June 13, 2017, Allianz paid $31,935.75 of Daily Benefits to Muse for services provided him from February 4, 2017, through April 21, 2017. *Id.* at 32-33.

On June 29, 2017, Allianz informed Muse it would not approve benefits beyond April 21, 2017, and cited Dr. Houshang Seradge's May 5, 2017 Chronically Ill Statement, which did not certify Muse as Chronically Ill. Defs.' Mot. Ex. 25 (Doc. No. 97-25) ("He noted Dr. Muse is independent with ambulation, eating and transferring. He did not provide an assessment concerning bathing, continence, dressing or toileting . . . . Based on information on file, we are unable to determine Dr. Muse requires assistance with at least two ADLs at this time . . . ."). Muse then submitted more documentation and invoices for payment of claims beyond that date. Defs.' Mot. Ex. 22 (Doc. No. 97-22). On July 11, 2017, Muse requested reconsideration of Allianz's denial and submitted a Chronically Ill Statement from Christopher Bouvette, MD, which certified that Muse needed stand-by assistance with ADLs of ambulation and transference and hands-on assistance with ADLs of bathing, continence, dressing, eating, and toileting. Defs.' Mot. Exs. 27 (Doc. No. 97-27), 34 (Doc. No. 97-34). On September 5, 2017, Allianz received Logs and invoices for services rendered through September 2, 2017. Defs.' Mot. Ex. 23 (Doc. No. 97-23).

Allianz and Muse's attorney continued to correspond regarding Allianz's ongoing review of the claims for Daily Benefits. Defs.' Mot. Exs. 28 (Doc. No. 97-28), 29 (97-29),

30 (Doc. No. 97-30). In November 2017, Allianz provided the medical records submitted by Muse and gathered by Allianz, as well as the video recordings taken by Allianz's investigator, to Stephen K. Holland, MD, for review. Compl. ¶ 39. Dr. Holland is the Medical Director and Chief Medical Officer of LTCG, a third-party administrator hired by Allianz to administer long-term-care-insurance claims. Defs.' Mot. Ex. 35 (Doc. No. 97-35). Dr. Holland issued a report on November 10, 2017, stating that he was not able to certify Defendant Muse as a Chronically Ill individual under the Policy. Dr. Holland also opined that Defendant Muse had regained his ability to perform ADLS no later than September 21, 2016. Holland R. (Doc. No. 98-6).

Pearson has been Muse's primary caregiver since 2014, although he has received some limited assistance from family members. Muse Dep. 93:12-96:11 (May 21, 2019) (Doc. No. 111-1). Pearson and Muse had a romantic relationship from 2001 through 2007 and intermittently after that for a couple of years. They considered themselves to be each other's significant other at various times. During 2008 through 2014, although Pearson dated other people, she still attended events with Muse and occasionally stayed at his home. Pearson Dep. 35:9-36:1; 36:20-37:11, 38:16-40:4 (May 22, 2019) (Doc. No. 111-2).

Pearson began staying at Muse's home on a regular basis soon after Muse suffered his fall in June 2014. Muse Dep. 90:3-6. Pearson was already providing care services for Muse when she became employed by Adlife. *Id.* 169:4-9; Pearson Dep. 94:24-95:3. During the time period from Muse's accident in 2014 until Pearson became employed by Adlife in July 2015, Muse was not paying Pearson for the caregiver services that she was providing. Muse Dep. 172:13-20. Muse does not recall receiving or seeing an invoice

from Adlife.  *Id.* 173:25-174:3.

The July 28, 2015 claim submitted by Muse to Allianz stated that Muse had been receiving services for "[a]ll daily activities" from Adlife, and had been the payer source for those services, since September 17, 2014.  Defs.' Mot. Ex. 1, at 5.  Adlife's care plan was faxed to Allianz on September 22, 2015, almost three months after services purportedly initiated.  Defs.' Mot. Ex. 12, at 6-9.  Adlife did not provide other documents requested by Allianz on this initial claim until September 30, 2015, and in those documents Adlife stated that services for Muse had been initiated July 1, 2015.  Defs.' Mot. Ex. 12, at 3.  Adlife invoices came from the owner of the company and were each signed by the owner and addressed to Muse at his home address.  *Id.*; Wuensch Dep. 40:11-20 (Doc. No. 97-32).  Muse's claim form was submitted by his attorney more than a year after the accident in which Muse claimed to have been injured.  Defs.' Mot. Ex. 1, at 2.

All three of the invoices received in September 2015 from Adlife were numbered invoice "1."  Defs.' Mot. Ex. 12, at 10-12.  All the Adlife invoices are numbered consecutively after the first three.  The weekly logs and notes received from Adlife described minutia of activities including: turning pages while reading books, doing emails for Muse, opening DVDs, assisting him going to events, meal preparation, errands, grocery shopping, housekeeping services, and personal-care services.  Defs.' Mot. Exs. 13 (Doc. No. 97-13), 14 (Doc. No. 97-14), 15 (Doc. No. 97-15), 17 (Doc. No. 97-17), 18, 20, 21, 22, 23.

The surveillance done November 23-25, 2015, reflects Muse going to the bank by himself, but the corresponding caregiver notes from those dates state that Pearson went to

the bank. Video of Nov. 23-25, 2015; Defs.' Mot. Ex. 14, at 8; Wuensch Dep. 48:24-49:15 (Doc. No. 97-32). The invoices, logs, and notes reflect Pearson provided services 24 hours a day every single day from July 1, 2015 to September 2, 2017, with no off days off or sick days. *See* Defs.' Mot. Exs. 12, 13, 14, 15, 17, 18, 20, 21, 22, 23; Wuensch Dep. 102:2-17, 107:14-20.

Pearson's arrangement with Adlife was that: (1) payment on the Policy was sent from Allianz to Muse, (2) the check would be deposited and cleared, (3) a check was sent to Adlife, and (4) only then would Adlife pay Pearson her salary. Pearson Dep. 65:5-22. Pearson did not advise Allianz of this payment arrangement. *Id.* 67:9-13.

### III. *Discussion*

In December 2017, Allianz filed this lawsuit, raising claims of: (i) declaratory relief, seeking a judicial determination that Muse is "not entitled to additional Policy benefits for services provided from April 22, 2017 to the present"; (ii) fraud and deceit against both Muse and Pearson; and (iii) conspiracy to defraud and deceive against both Muse and Pearson. Compl. ¶¶ 42-57. Muse alleges counterclaims against Allianz for (i) breach of contract and (ii) breach of the duty of good faith and fair dealing. *See* Def. Muse Answer & Countercls. ¶¶ 135-152 (Doc. No. 9); Order of June 25, 2018 (Doc. No. 27).

In their Motion, Defendants seek summary judgment on Allianz's state-law claims of: (i) fraud and deceit; and (ii) conspiracy to defraud and deceive. *See* Defs.' Mot. at 18-23, 25-30. Defendants also argue that Allianz may not rely upon its cited statute—title 36, section 4426.1 of the Oklahoma Statutes—as a basis for its request to "rescind or void" the Policy in connection with the fraud-and-deceit claim. *See id.* at 23-25; Compl. ¶ 53.

11

A. *Allianz's Claims for Fraud and Deceit*[1]

Under Oklahoma law, the elements of a fraud claim are: "(1) a false material misrepresentation; (2) made as a positive assertion which is known to be false or is made recklessly without knowledge of the truth; (3) with the intention that it be acted upon; and (4) which is relied on by the other party to his detriment." *Simon v. Metro. Prop.*, No. CIV-08-1008-W, 2014 WL 12479649 (W.D. Okla. Apr. 17, 2014) (citing *Bowman v. Presley*, 212 P.3d 1210 (Okla. 2009)); *see also Reirdon v. Cimarex Energy Co.*, No. CIV-16-445-SPS, 2019 WL 2610115, at *4 (E.D. Okla. June 25, 2019). "Fraud is never presumed and each of its elements must be proved by clear and convincing evidence." *Simon*, 2014 WL 12479649, at *6. "Although the issue of fraud is generally a question of fact, summary judgment is appropriate where, under the uncontroverted facts, a plaintiff fails to demonstrate the viability of [its] claim." *PWB Dev., L.L.C. v. Acadia Ins. Co.*, No. CIV-17-387-R, 2018 WL 4088793, at *5 (W.D. Okla. Aug. 27, 2018) (alteration and internal quotation marks omitted).

When the present evidence is considered in Allianz's favor, it is sufficient to show a genuine factual dispute as to each of these elements. Allianz has presented evidence that, if believed, supports a finding that the invoices and logs presented a knowingly "false"

---

[1] "The basic elements of common law fraud and deceit are identical under Oklahoma law," and courts generally treat these tort claims as synonymous, evaluating them together as a fraud claim. *Lillard v. Stockton*, 267 F. Supp. 2d 1081, 1111 (N.D. Okla. 2003); *see, e.g.*, *id.* at 1111-12; *Hitch Enters., Inc. v. Cimarex Energy Co.*, 859 F. Supp. 2d 1249, 1259 & n.5 (W.D. Okla. 2012). "The tort of fraud or deceit provides a remedy to a person who suffers damages due to his reliance upon another's willful misstatement of fact." *Cooper v. Parker-Hughey*, 894 P.2d 1096, 1100 (Okla. 1995). The parties likewise have characterized these allegations collectively as a fraud claim.

12

portrayal of the services provided to Muse by Pearson, and of the payment mechanism worked out between Muse, Pearson, and Adlife, with the intention that these representations be acted upon as a basis for payment. There is also sufficient evidence for a reasonable jury to find that these false representations were material to Allianz's determinations to issue benefits and that Allianz did rely upon these representations to its detriment in issuing thousands of dollars of payment to Muse.

For example, false representations as to whether Muse actually was incurring any financial liability for the services allegedly provided by Pearson through April 21, 2017, or as to Pearson's expectation of payment being dependent upon Allianz's claims decision, are statements that reasonably can be viewed as material to Allianz's determination to pay benefits for those services, in light of the potential applicability of the express exclusion in the Policy cited above. *See* Defs.' Mot. Ex. 1, at 5 (Muse identifying himself as the "[p]ayer source" for services provided by Adlife); Muse Dep. 172:13-20 (Muse testifying that he was not paying Pearson for caregiver services from the time of his accident in June 2014 until she became employed by Adlife in July 2015), 173:25-174:3 (Muse testifying that he did not recall ever receiving an invoice from Adlife); Pearson Dep. 65:5-22 (Pearson testifying that she was not paid by Adlife until Muse forwarded his Allianz payments to Adlife); Policy at 16 ("No benefits will be paid for any . . . care . . . or service(s) . . . for which you have no financial liability or that [are] provided at no charge in the absence of insurance.").[2]

---

[2] The Court notes that in denying summary judgment it relies solely on the evidence in the record and the inferences that may be reasonably drawn therefrom. The Court allows no evidentiary value to the bare conclusions in Allianz's briefing, unaccompanied by any

In addition, the evidence outlined above—particularly the video footage—reflects a genuine dispute as to whether Muse and Pearson's submissions to Allianz included knowingly false statements to the effect that Muse is unable to perform his ADLs and was receiving services all day, every day in accordance with the certifications submitted to Allianz. If Muse actually was able to perform ADLs and other activities and so was not receiving the identified services from Pearson, then he was ineligible for the Daily Benefits payments. *See id.* at 13 (providing that Muse would receive benefits if he was certified as Chronically Ill and "receive[d] services" covered by the Policy); Wuensch Dep. 109:25-111:18 (Allianz corporate representative testifying that the activities performed by Muse on a surveillance video "would seem to be contrary with" the services alleged to have been performed for Muse by Pearson) (Doc. No. 97-33). Combined with the numerous irregularities in the submissions to Adlife summarized above, which Allianz's corporate representative identified as "red flags" for fraud, Allianz has presented evidence that, viewed in the light most favorable to Allianz, could allow a reasonable jury to find that Muse was not receiving home-health services of the type and frequency asserted by Defendants and was not properly certifiable as Chronically Ill. *See* Wuensch Dep. 34:11-24, 40:11-20, 43:6-18, 47:2-48:5, 50:9-16, 53:3-13, 56:25-58:9 (Doc. No. 97-32).

---

citation to evidence, that attempt to show materiality and causation based solely on counsel's supposition as to what Allianz would have done under different circumstances. *See* Pl.'s Resp. at 21-22 ("Had Allianz known that Muse was not paying Adlife for services, Allianz would not have paid benefits to Muse under the policy . . . ."); *id.* at 22 ("Had Allianz known this information, Allianz would not have paid benefits to Muse under the policy."); *see also Mosier v. Maynard*, 937 F.2d 1521, 1525 (10th Cir. 1991) ("Factual statements contained in defendants' brief attributable to counsel . . . do not constitute summary judgment evidence[.]").

Defendants argue that Allianz's continued payment of benefits even after having access to the video footage of Muse prevents Allianz from proving fraud and deceit now. *See* Defs.' Mot. at 21-22. Allianz has presented evidence that it made a reasoned decision to issue payments as a matter of "good faith." Wuensch Dep. 152:18-153:3. Allianz also has presented evidence that it obtained additional material information after it made its final authorization of payment in June 2017, namely Dr. Holland's November 2017 opinion that Muse could not be certified as Chronically Ill and had recovered his ability to perform his ADLs no later than September 21, 2016. *See* Holland R. at 2-6. Moreover, Defendants cite no authority for the proposition that an insurer's decision to pay a pending claim forecloses a later lawsuit premised upon the allegedly fraudulent submission of that claim, and the Court will not entertain that issue absent a properly developed argument.

For these reasons, Defendants have not shown a lack of genuine material factual disputes on these claims and have not shown that they are entitled to judgment as a matter of law, even considering Oklahoma's clear-and-convincing standard of proof. *See PWB Dev.*, 2018 WL 4088793, at *5.

### B. *Allianz's Request for Rescission of the Policy Under Oklahoma Statute*

In its Complaint, Allianz contends that based upon Defendants' fraudulent conduct, "Allianz is entitled to rescind or void the Policy pursuant to 36 O.S. § 4426.1." Compl. ¶ 53. Defendants argue that this statute cannot provide a basis for Allianz's request for rescission of the Policy. *See* Defs.' Mot. at 23-25.

The cited statute provides:

§ 4426.1. Rescission or denial of claim upon grounds of misrepresentation

15

A. For a policy or certificate that has been in force for less than six (6) months, an insurer may rescind a long-term care insurance policy or certificate or deny an otherwise valid long-term care insurance claim *upon a showing of misrepresentation that is material to the acceptance for coverage*.

B. For a policy or certificate that has been in force for at least six (6) months but less than two (2) years, an insurer may rescind a long-term care insurance policy or certificate or deny an otherwise valid long-term care insurance claim *upon a showing of misrepresentation that is both material to the acceptance for coverage and which pertains to the conditions for which benefits are sought*.

C. After a policy or certificate has been in force for two (2) years, it is not contestable upon the grounds of misrepresentation alone; such policy or certificate may be contested only *upon a showing that the insured knowingly and intentionally misrepresented relevant facts relating to the insured's health*.

. . . .

E. *If an insurer has paid benefits under the long-term care insurance policy or certificate, the benefit payments may not be recovered by the insurer in the event that the policy or certificate is rescinded*.

Okla. Stat. tit. 36, § 4426.1 (emphasis added).

Defendants argue that the italicized language above demonstrates that the statute "provides a remedy for misrepresentation by an insured in the *application* for insurance," rather than for a misrepresentation made in the course of obtaining benefits as alleged here. Defs.' Mot. at 24. Allianz correctly notes that that the provision applicable to the current case, subsection 4426.1(C), contains no reference to the application process and does not limit the statutory remedy only to misrepresentations made in that process. *See* Pl.'s Resp. at 25; Policy at 5 (reflecting the Policy's effective date as November 1, 2000); Okla. Stat. tit. 36, § 4426.1(C) (providing that a policy that has been in force for two years or longer is contestable "only upon a showing that the insured knowingly and intentionally misrepresented relevant facts relating to the insured's health").

The Court agrees with Allianz that the relevant provision does not, by its terms, limit the insured's misrepresentation to one made during the application process or otherwise preclude rescission based upon the timing of the misrepresentations allegedly made here. Defendants' cited authorities do not address section 4426.1 and do not show that summary judgment is proper on this aspect of Allianz's claim. At this juncture, the Court will not foreclose Allianz's ability to seek rescission under the statute, should the alleged fraudulent conduct be proven. *Cf. Am. Commerce Ins. Co. v. Harris*, No. CIV-07-423-SPS, 2009 WL 3233738, at *3 (E.D. Okla. Sept. 25, 2009) ("Oklahoma appears to follow the majority rule that any fraud or misrepresentation under an insurance policy voids all coverage under the policy.").

C. *Allianz's Claims for Conspiracy to Defraud and Deceive*

Finally, Defendants seek summary judgment on Allianz's claims of conspiracy to defraud and deceive—i.e., the allegation that Defendants "knowingly entered into an agreement to defraud and deceive Allianz and that they followed through on their scheme" by planning to submit falsified logs and other reports to Allianz in an effort to obtain payments to which they were not entitled. Compl. ¶¶ 54-57.

Under Oklahoma law,

> A civil conspiracy consists of a combination of two or more persons to do an unlawful act, or to do a lawful act by unlawful means. Unlike its criminal counterpart, civil conspiracy itself does not create liability. To be liable the conspirators must pursue an independently unlawful purpose or use an independently unlawful means. There can be no civil conspiracy where the *act* complained of and the *means employed* are lawful.

*Brock v. Thompson*, 948 P.2d 279, 294 (Okla. 1997). "A claim of civil conspiracy is not an independent, actionable claim; there must be an underlying tortious act." *Tullius v.*

17

*Metro. Prop. & Cas. Ins. Co.*, No. CIV-10-272-M, 2010 WL 3259837, at *3 (W.D. Okla. Aug. 17, 2010). "In essence, a civil conspiracy claim enlarges the pool of potential defendants from whom a plaintiff may recover for an underlying tort." *Brock*, 948 P.2d at 294 n.66.

The evidence as outlined above with respect to the fraud-and-deceit claims is sufficient to defeat summary judgment as "against the individual conspirators," here Muse and Pearson. *Schovanec v. Archdiocese of Okla. City*, 188 P.3d 158, 175 (Okla. 2008) (internal quotation marks omitted). That evidence (including their long-term personal relationship, their payment arrangement and lack of any other home-health caregiver for Muse, and the discrepancies between Pearson's identified activities and those shown on video) likewise presents genuine fact issues as to whether Muse and Pearson had "a meeting of minds" on the submission of falsified records that, if resolved in Allianz's favor, could reasonably support a verdict in Allianz's favor on these claims. *Id.* (internal quotation marks omitted). Summary judgment is therefore inappropriate.

D. *Allianz's Motion to Supplement*

After Defendants' Motion for Partial Summary Judgment was fully briefed, Allianz filed a Motion to Supplement (Doc. No. 126), seeking leave to supplement its Response to the summary-judgment Motion with certain deposition testimony from Adlife's corporate representative. The Motion to Supplement is not yet at issue but states that Defendants object to the proposed supplementation. *See* Pl.'s Mot. to Suppl. at 3. Because Allianz has shown that Defendants' Motion should be denied on the current record, the Court need not consider the supplementation issue as to Allianz's Response.

CONCLUSION

As outlined above, Defendants' Motion for Partial Summary Judgment (Doc. No. 97) is DENIED.  Allianz's Motion to Supplement (Doc. No. 126) is DENIED AS MOOT with respect to supplementation of Allianz's summary-judgment response.

IT IS SO ORDERED this 18th day of December, 2019.

_____
CHARLES B. GOODWIN
United States District Judge