UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA, | ) ) ) | |
| Plaintiff/Counterclaim Defendant, | ) ) | |
| v. | ) ) | No. CIV-17-1361-G |
| GENE L. MUSE, M.D., | ) ) | |
| Defendant/Counterclaimant; | ) ) | |
| and | ) ) | |
| PATIA PEARSON, | ) ) | |
| Defendant. | ) | |

# ORDER

Now before the Court is the Motion for Partial Summary Judgment (Doc. No. 98) filed by Plaintiff/Counterclaim Defendant Allianz Life Insurance Company of North America ("Allianz"). Defendant/Counterclaimant Gene L. Muse, MD ("Muse") has filed a Response (Doc. No. 112), to which Allianz has replied (Doc. No. 122). As outlined below, Allianz's Motion is granted in part and denied in part.

*I.    Standard of Review*

Summary judgment is a means of testing in advance of trial whether the available evidence would permit a reasonable jury to find in favor of the party asserting a claim. The Court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A party that moves for summary judgment has the burden of showing that the undisputed material facts require judgment as a matter of law in its favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To defeat summary judgment, the nonmovant need not convince the Court that it will prevail at trial, but it must cite sufficient evidence admissible at trial to allow a reasonable jury to find in the nonmovant's favor—i.e., to show that there is a question of material fact that must be resolved by the jury. *See Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

> Parties may establish the existence or nonexistence of a material disputed fact by:
>
> - citing to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in the record; or
>
> - demonstrating "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1)(A), (B). While the Court views the evidence and the inferences drawn from the record in the light most favorable to the nonmoving party, *see Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the [nonmovant]." *Liberty Lobby*, 477 U.S. at 252.

II.    *Relevant Facts*

In December 2017, Allianz filed its Complaint (Doc. No. 1) alleging that a dispute had arisen in connection with a long-term-care insurance policy ("the "Policy") issued in 2000 by Allianz to Muse. *See* Compl. ¶¶ 11-41; *id.* Ex. 1 ("Policy") (Doc. No. 1-1). The Policy provides "Daily Benefits" for "Home and Community Services," which include payment for "Home Care" services provided in connection with the activities of daily living—or ADLs—of bathing, continence, dressing, eating, toileting, and transferring. Policy at 10. To be eligible for such Daily Benefits, the insured must be certified within the previous 12 months by a licensed health care practitioner as being "Chronically Ill"— i.e., (1) being unable to perform, without "Substantial Assistance," at least two ADLs for a period of at least 90 days due to loss of functional capacity or (2) having a severe "Cognitive Impairment." *Id.* at 11, 13-14. "Substantial Assistance" means "hands-on or stand-by assistance of another person without which you would be unable to perform [ADLs]." *Id.* at 13.

The Policy provides Muse with unlimited Daily Benefits for Home and Community Services for the period that Muse meets the Eligibility for Benefits. *See id.* at 5, 13-14. If eligible for payment of benefits, Muse receives the full Daily Benefit for covered services, "regardless of actual charges incurred" by Muse. *Id.* at 8. The Policy provides, however, that "[n]o benefits will be paid for any . . . care . . . or [services]" "for which [Muse] ha[s] no financial liability or that [are] provided at no charge in the absence of insurance." *Id.* at 16.

Muse, who previously worked as an orthopedic surgeon, alleges that he suffers from

chronic physical ailments, as well as impairments that arose when he fell from a ladder on June 28, 2014.  Def. Muse Answer & Countercls. (Doc. No. 9) ¶¶ 69-70.  Muse filed his first claim for Daily Benefits on July 28, 2015, asserting that he had been paying for home health-care services for "[a]ll daily activities" from Adlife HomeCare LLC ("Adlife," later known as "Alpha Private Services LLC") since September 17, 2014.  Defs.' Mot. Ex. 1 (Doc. No. 97-1); *see also* Compl. ¶ 17.

On September 30, 2015, Muse submitted to Allianz: (1) a copy of Adlife's state license; (2) Adlife's care plan for Muse; and (3) itemized invoices and Weekly Documentation Logs from Adlife certifying under penalty of law that Defendant Patia Pearson ("Pearson"), who is a Home Health Aide with Adlife, had provided Muse with the identified home-health services every day from July 1, 2015, through September 25, 2015.  Defs.' Mot. Ex. 12 (Doc. No. 97-12); Wuensch Dep. 35:5-36:1 (Aug. 27, 2019) (Patty Wuensch testifying in role as Allianz corporate representative) (Doc. No. 97-32); *see also* Compl. ¶ 19; Muse Answer & Countercls. ¶ 19.

On October 26, 2015, a letter from Allianz's long-term-care benefits administrator, issued on Allianz letterhead, notified Muse that he was eligible for Daily Benefits and that Muse's "benefit eligibility period is approved through January 26, 2016 provided [Muse] continue[s] to satisfy the policy's benefit eligibility requirements."  Defs.' Mot. Ex. 3 (Doc. No. 97-3).  On November 9, 2015, Allianz paid the claim for Daily Benefits of $32,728.53 to Muse for services provided him from July 1, 2015, to September 25, 2015.  Defs.' Mot. Ex. 26 (Doc. No. 97-26) at 2-4.  On January 21, 2016, Allianz paid $22,232.84 for Daily Benefits for services provided him from September 26, 2015, through November 22, 2015.

*Id.* at 5-6.

On January 15, 2016, however, Allianz sent a letter to Muse informing him that "because the level of impairment" claimed by Muse—i.e., daily assistance with his ADLs and numerous other tasks—"did not appear to be consistent with medical information," Allianz had conducted an "activities check," the results of which "conflict[ed] with the documented care needs described in the Weekly Documentation Logs." Defs.' Mot. Ex. 4 (Doc. No. 97-4). The letter concluded, "The activities we have observed suggest that Dr. Muse is capable of performing the Activities of Daily Living without Substantial Assistance of another person. Consequently, we have concluded that he is not Chronically Ill beginning on November 23, 2015, and no further benefits will be approved for services received on or after this date." *Id.*

Muse then appealed this claim denial, submitting a letter from Michael Winzenread, MD, asserting that Muse needed assistance with the ADLs of bathing, dressing, and toileting. Defs.' Mot. Ex. 5 (Doc. No. 97-5); *see also* Compl. ¶ 24. Allianz then advised Muse that it would be seeking medical records from Dr. Winzenread and requesting an in-home nursing assessment by a nurse care manager. Defs.' Mot. (Doc. No. 97-6). The in-home assessment was conducted on or about July 20, 2016. Comp. ¶ 25. Muse and Pearson both participated in the assessment and asserted that Muse required assistance from Pearson with bathing, continence, dressing, eating, toileting, and transferring. *Id.*; *see also* Muse Answer & Countercls. ¶ 25. On August 18, 2016, Allianz upheld the denial of benefits for service dates after November 22, 2015. Defs.' Mot. Ex. 8 (Doc. No. 97-8).

Muse appealed this decision through his attorney, submitting additional materials

for review on October 26, 2016. Defs.' Mot. Ex. 9 (Doc. No. 97-9). On March 3, 2017, Allianz notified Muse that it had reconsidered and would pay the claims submitted for Daily Benefits rendered from November 23, 2015, through January 1, 2016. Defs.' Mot. Ex. 10 (Doc. No. 97-10). On March 10, 2017, Allianz paid Daily Benefits of $15,800.00 to Muse for services provided him during that period. Defs.' Mot. Ex. 26, at 26-27.

Muse continued to submit claims with invoices and documentation logs showing home-health services provided by Pearson during 2016 and 2017. Defs.' Mot. Exs. 18 (Jan. 2, 2016—Apr. 1, 2016) (Doc. No. 97-18), 19 (Apr. 2, 2016—July 31, 2016) (Doc. No. 97-19), 20 (Aug. 1, 2016—Feb. 3, 2017) (Doc. No. 97-20). On April 19, 2017, Allianz paid Daily Benefits of $83,740.00 to Muse for services provided him from January 2, 2016, through July 31, 2016. Defs.' Mot. Ex. 26, at 28-29. On May 5, 2017, Allianz paid $75,741.25 of Daily Benefits to Muse for services provided him from August 1, 2016, through February 3, 2017. *Id.* at 30-31. On June 13, 2017, Allianz paid $31,935.75 of Daily Benefits to Muse for services provided him from February 4, 2017, through April 21, 2017. *Id.* at 32-33.

On June 29, 2017, Allianz informed Muse it would not approve benefits beyond April 21, 2017. Defs.' Mot. Ex. 25 (Doc. No. 97-25) ("Based on information on file, we are unable to determine Dr. Muse requires assistance with at least two ADLs at this time . . . ."). Muse then submitted more documentation and invoices for payment of claims beyond that date. Defs.' Mot. Ex. 22 (Doc. No. 97-22). On July 11, 2017, Muse requested reconsideration of Allianz's denial and submitted a Chronically Ill Statement from a physician who certified that Muse needed stand-by assistance with two ADLs and hands-

6

on assistance with five ADLs. Defs.' Mot. Exs. 27 (Doc. No. 97-27), 34 (Doc. No. 97-34). On September 5, 2017, Allianz received logs and invoices for services rendered through September 2, 2017. Defs.' Mot. Ex. 23 (Doc. No. 97-23).

Allianz and Muse's attorney continued to correspond regarding Allianz's ongoing review of the claims for Daily Benefits. Defs.' Mot. Exs. 28 (Doc. No. 97-28), 29 (97-29), 30 (Doc. No. 97-30). In November 2017, Allianz provided the medical records submitted by Muse and gathered by Allianz, as well as video recordings taken by Allianz's investigator, to Stephen K. Holland, MD, for review. Compl. ¶ 39. Dr. Holland is the Medical Director and Chief Medical Officer of LTCG, a third-party administrator hired by Allianz to administer long-term-care-insurance claims. Defs.' Mot. Ex. 35 (Doc. No. 97-35). Dr. Holland issued a report on November 10, 2017, stating that he was not able to certify Defendant Muse as a Chronically Ill individual under the Policy. Dr. Holland also opined that Defendant Muse had regained his ability to perform ADLS no later than September 21, 2016. Holland R. (Doc. No. 98-6).

Pearson has been Muse's primary caregiver since 2014, although Muse has received some limited assistance from family members. Muse Dep. 93:12-96:11 (May 21, 2019) (Doc. No. 111-1). Pearson and Muse had a romantic relationship from 2001 through 2007 and intermittently after that for a couple of years. They considered themselves to be each other's significant other at various times. During 2008 through 2014, although Pearson dated other people, she still attended events with Muse and occasionally stayed at his home. Pearson Dep. 35:9-36:1; 36:20-37:11, 38:16-40:4 (May 22, 2019) (Doc. No. 111-2).

Pearson began staying at Muse's home on a regular basis soon after Muse suffered

7

his fall in June 2014. Muse Dep. 90:3-6 (Doc. No. 111-1). Pearson was already providing care services for Muse when she became employed by Adlife. *Id.* 169:4-9; Pearson Dep. 94:24-95:3 (Doc. No. 111-2). During the time period from Muse's accident in 2014 until Pearson became employed by Adlife in July 2015, Muse was not paying Pearson for the caregiver services that she was providing. Muse Dep. 172:13-20 (Doc. No. 111-1); *see also* Pearson Dep: 17:23-18:2 (Doc. No. 98-2) (Pearson testifying that they had a verbal agreement that she would be paid "at some point"). Muse does not recall receiving or seeing an invoice from Adlife. Muse Dep. 173:25-174:3 (Doc. No. 111-1).

The July 28, 2015 claim submitted by Muse to Allianz stated that Muse had been receiving services for "[a]ll daily activities" from Adlife, and had been the payer source for those services, since September 17, 2014. Defs.' Mot. Ex. 1, at 5. All three of the invoices received in September 2015 from Adlife were numbered invoice "1." Defs.' Mot. Ex. 12, at 10-12. All the Adlife invoices are numbered consecutively after the first three. The weekly logs and notes received from Adlife described minutia of numerous activities performed by Pearson. Defs.' Mot. Exs. 13 (Doc. No. 97-13), 14 (Doc. No. 97-14), 15 (Doc. No. 97-15), 17 (Doc. No. 97-17), 18, 20, 21 (Doc. No. 97-21), 22 (Doc. No. 97-22), 23.

> On August 31, 2016, Muse's attorney stated in a letter to Allianz:
>
> Your bad faith actions in even denying benefits and requiring this appeal have caused Ms. Pearson to borrow money until such time as the benefits are restored or she has to declare bankruptcy due to your refusal to reinstate benefits. She is very loyal to Dr. Muse and cannot bring herself to walk out on him and leave him with no help.

Pl.'s Mot. Ex. 3 (Doc. No. 98-3) at 167. On January 31, 2017, Muse's attorney noted in a

letter to Allianz that "Ms. Pearson is close to having to declare bankruptcy due to Allianz's failure to pay Dr. Muse his benefits on a policy he paid for all these years." *Id.* at 180. On February 15, 2017, Muse's attorney stated in a letter to Allianz:

> Allianz's refusal of payments for services performed by Patia Pearson for Dr. Muse is the sole basis for her financial crises. Dr. Muse of course paid AdLife for the service Ms. Pearson performed while Allianz was paying benefits. Ms. Pearson does not expect AdLife to pay for services that she performed for Dr. Muse if Dr. Muse did not have the money to pay AdLife *nor is it AdLife's fault she has not been paid*. The blame lies clearly with Allianz for stopping Dr. Muse's benefits.

*Id.* at 183. Muse's attorney gathered the information in these letters from Pearson and was authorized by Pearson to communicate that information to Allianz. Pearson Dep. 93:4-96:1 (Doc. No. 111-2).

Pearson's arrangement with Adlife was that: (1) payment on the Policy was sent from Allianz to Muse, (2) the check would be deposited and cleared, (3) a check in that same amount was sent to Adlife, and (4) only then would Adlife pay Pearson her salary. Pearson Dep. 65:5-22 (Doc. No. 111-2). Pearson did not advise Allianz of this payment arrangement. *Id.* 67:9-13.

Pearson's contract with Adlife provided that Adlife would hire Pearson as an independent contractor, that Pearson's compensation would be paid by Adlife "once [Muse's] insurance company reimburses [Muse]" for Pearson's services and Muse pays Adlife, and that if Muse did not pay Adlife then Muse himself was responsible for Pearson's compensation.[1] Pl.'s Reply Ex. 3 (Doc. No. 122-2) at 2-3, 5-6. Muse's contract

---

[1] Muse was not a party to this contract. *See* Pl.'s Reply Ex. 3, at 4, 7.

9

with Adlife provided that Adlife's invoices "shall be due and payable" "when [Muse] receives [a] check from [the] insurance company." Pl.'s Reply Ex. 5 (Doc. No. 122-5) at 2, 3.

Although Pearson did not terminate her relationship with Adlife until January 2018, Muse paid Adlife only for services provided by Pearson through April 21, 2017, which is the last date of Pearson's services for which Allianz paid Daily Benefits to Muse. Pl.'s Reply Ex. 2 (Doc. No. 122-2) at 2; Def.'s Resp. Ex. 3 (Doc. No. 112-3) at 2-15; Muse Dep. 221:9-19 (Doc. No. 112-4); Pearson Dep. 19:14-15 (Doc. No. 112-2). Pearson was not paid for caregiver services provided from April 22, 2017, through December 31, 2017—i.e., during the period for which Allianz denied benefits and did not issue a check to Muse—by either Muse or Adlife. Pl.'s Reply Ex. 2, at 2; Def.'s Resp. Ex. 3, at 2-15; Muse Dep. 221:9-19 (Doc. No. 112-4).

After Pearson stopped working for Adlife in January 2018, Muse began paying her $3000 per month directly. Pearson Dep. 19:14-15, 19:24-20-3 (Doc. No. 112-2); Muse Dep. 92:5-93:7, 181:13-17 (Doc. No. 98-1); Def.'s Resp. Ex. 3, at 16-22. Muse has submitted requests to Allianz for Daily Benefits for services rendered by Pearson through March 30, 2018. Pl.'s Mot. Ex. 9 (Doc. No. 98-9) at 62-65, 66-113.

III. *Discussion*

In December 2017, Allianz filed this lawsuit, raising claims of: (i) declaratory relief, seeking a judicial determination that Muse is "not entitled to additional Policy benefits for services provided from April 22, 2017 to the present"; (ii) fraud and deceit against both Muse and Pearson; and (iii) conspiracy to defraud and deceive against both Muse and

10

Pearson. Compl. ¶¶ 42-57. Muse alleges counterclaims against Allianz for (i) breach of contract and (ii) breach of the duty of good faith and fair dealing. *See* Def. Muse Answer & Countercls. ¶¶ 135-152 (Doc. No. 9); Order of June 25, 2018 (Doc. No. 27).

### A. *Allianz's Claim for Declaratory Judgment*

Allianz first seeks summary judgment on its claim that it is entitled to a declaratory judgment that Muse is not entitled to the benefits he has sought under the Policy for services performed from April 22, 2017, through March 30, 2018. Pl.'s Mot. at 23. Specifically, Allianz relies upon the following exclusion in the Policy: "No benefits will be paid for any . . . care, treatment, or service(s) . . . for which you have no financial liability or that is provided at no charge in the absence of insurance." Policy at 16 (the "Exclusion").

#### 1. *Whether Allianz May Properly Seek Summary Judgment*

Muse first argues that Allianz's Motion improperly seeks declaratory judgment on a different basis than did Allianz's Complaint, such that Muse lacked notice that Allianz would rely upon the Exclusion as a basis for its claim. *See* Def.'s Resp. at 31-33. Although Muse is correct that the Complaint specifically alleged Muse's ability to perform ADLs as a basis for entry of a declaratory judgment, the pleading also expressly cited the Exclusion quoted above and incorporated that language into its declaratory-relief claim. *See* Compl. ¶¶ 16, 42. Further, the request for declaratory relief is not solely premised upon the ADL issue, *see id.* ¶¶ 45-46, and the Complaint elsewhere alleged that Muse falsely stated that he had "incurred actual expenses in receiving care from Pearson when he did not do so." *Id.* ¶ 48.

Thus, the Court finds that the Motion does not raise a "new claim" or improperly introduce a surprise theory of recovery. The Motion shall not be denied on this basis.

*2. Whether Allianz Is Entitled to Judgment as a Matter of Law*

*a. Services Rendered April 22, 2017, through December 31, 2017*

According to Allianz, the evidence in the record shows that payment of Daily Benefits is precluded by the Exclusion, "that Muse only paid Adlife if Allianz paid benefits under the Policy," and that "Pearson provided assistance at no charge in the absence of insurance." Pl.'s Mot. at 24. Accordingly, the Court must first examine whether Allianz has shown that the Exclusion applies to prevent Muse from being eligible for Daily Benefits payments from April 22, 2017, through December 31, 2017, due to Muse having "no financial liability" for Pearson's services and/or Pearson's services "being provided at no charge in the absence of insurance." Policy at 16.

The record before the Court, as summarized above, supports Allianz's contention that the services provided by Pearson were provided at no charge if there was no payment to Muse issued by Allianz. Prior to the Policy being invoked, Pearson provided her caregiver services to Muse at no cost. During the period at issue, Pearson's payment from Adlife was contingent upon Muse being paid by Allianz and then sending a check to Adlife. The contract between Pearson and Adlife specified that Adlife would pay Pearson "once [Muse's] insurance company reimburses [Muse]" for Pearson's services and that if Muse did not pay Adlife, then Muse—*not* Adlife—was responsible for paying Pearson. Pl.'s Reply Ex. 3, at 2-3, 5-6. And when Allianz withheld payment to Muse, Muse's attorney stated to Allianz in writing that Pearson—not Muse or Adlife—was going to be

12

bankrupted.

Muse disputes that the Exclusion applies, but he fails to cite to adequate support in the record to show a genuine dispute as to that fact. *See* Def.'s Resp. at 29, 33 (citing testimony to the effect that Muse was not aware of Pearson's agreement with Adlife during the relevant time period and only began paying Pearson directly in January 2018). Pursuant to their contract, Muse's obligation to pay Adlife was contingent upon his receipt of benefits from Allianz. There is no evidence in the record that Adlife was ever paid for the service dates of April 22, 2017, through December 31, 2017, when Allianz was denied benefits. Nor is there evidence to show that Pearson was ever paid for these dates. Accordingly, there is no evidence from which to reasonably infer that Muse was financially liable for the services rendered during this time or that Muse would be held liable for these services in the absence of insurance. Absent more, "[t]he mere existence of a scintilla of evidence in support of" Muse's position is insufficient, and Allianz is entitled to judgment as a matter of law. *Liberty Lobby*, 477 U.S. at 252; *cf. N.M. ex rel. Kershner v. Equitable Life Assurance Soc'y of U.S.*, 447 F.2d 620, 623 (10th Cir. 1971) (upholding judgment for the insurer on where the insured "was not charged for, and incurred no expenses for," his son's care and thus "suffered no loss" and noting that the purpose of the policy was "not to provide a windfall for the insured or a third party").

### b. Services Rendered January 1, 2018, through March 30, 2018

The undisputed evidence reflects that Pearson quit working for Adlife no later than January 2018 and began receiving monthly payments directly from Muse for services starting that same month. The record before the Court, even construed in Muse's favor,

does not reasonably support a finding that Pearson was working for a Home Health Care Agency from January-March 2018 in addition to being Muse's full-time caregiver. *See* Pearson Dep. 19:14-15 (Doc. No. 112-2); Muse Dep. 91:20-93:11 (Doc. No. 111-1). As such, Muse is not eligible under the Policy for Daily Benefits for the services provided by Pearson during this time. *See* Pl.'s Reply at 10-11; Policy at 11 (providing that the Home Health Aide must provide services "under the supervision of a Home Health Care Agency," which is "a Hospital, agency, or other provider licensed under state law, if any, to provide Home Care"), 13 (providing that benefits will be paid for receipt of "services covered under this Policy").[2]

### B. Muse's Counterclaim for Breach of Contract

As noted, Muse alleges a counterclaim against Allianz for breach of contract. *See* Def. Muse Answer & Countercls. ¶¶ 135-139. Allianz's Motion mentions this counterclaim but nowhere addresses the elements or evidence relevant thereto. *See* Pl.'s Mot. at 5, 34. Accordingly, Allianz has not shown it is entitled to judgment in this regard.

### C. Muse's Bad-Faith Counterclaim

Muse also has raised a counterclaim against Allianz alleging that the insurer "breached the implied covenant of good faith and fair dealing" in handling Muse's claims under the Policy. Def. Muse Answer & Countercls. ¶¶ 140-141. Allianz seeks summary

---

[2] Allianz also cites evidence indicating that Pearson, who was an independent contractor for Adlife, was not "under the supervision of" Adlife even during her employment there. *See* Pl.'s Reply at 8-9, 10; Pl.'s Reply Exs. 3 (Doc. No. 122-3), 4 (Doc. No. 122-4).

judgment on this counterclaim on several grounds, including Muse's lack of coverage under the Policy. *See* Pl.'s Mot. at 26-27.

Under Oklahoma law, which governs this diversity case, a claim for breach of this duty is also referred to as a "bad faith" claim. *Tabernacle v. Church Mut. Ins. Co.*, No. CIV-11-515-M, 2012 WL 4128291, at *2 n.3 (W.D. Okla. Sept. 18, 2012). Oklahoma law provides that an insurer has an implied duty of good faith and fair dealing toward its insureds, and the violation of that duty gives rise to an action in tort. *Harris v. Progressive Direct Ins. Co.*, 740 F. App'x 900, 908 (10th Cir. 2018). Liability for breach of the implied covenant of good faith and fair dealing requires "'a clear showing that the insurer unreasonably, and in bad faith, withholds payment of the claim of its insured.'" *Id.* (quoting *Christian v. Am. Home Assurance Co.*, 577 P.2d 899, 905 (Okla. 1977)). To establish a cause of action against an insurance company for bad faith under Oklahoma law, the plaintiff must show:

> 1) coverage under the insurance policy and that the insurer was required to take reasonable actions; 2) the actions of the insurer were unreasonable under the circumstances; 3) the insurer failed to deal fairly and act in good faith toward the insured in its handling of the claim; and 4) breach or violation of the duty of good faith and fair dealing was the direct cause of any damages that the insured sustained.

*Id.* (citing *Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080, 1093 (Okla. 2005)). "'The absence of any one of these elements defeats a bad faith claim.'" *Toppins v. Minn. Life Ins. Co.*, 460 F. App'x 768, 771 (10th Cir. 2012) (quoting *Beers v. Hillory*, 241 P.3d 285, 292 (Okla. Civ. App. 2010)).

As outlined above, Muse is unable to establish a genuine dispute as to whether he was eligible for benefits under the Policy either through December 31, 2017, or thereafter. *See* discussion *supra*; *cf.* Wuensch Dep. 152:18-153:8 (Doc. No. 111-3) (Allianz corporate representative testifying that payments to Muse through April 21, 2017, were not based upon a decision that he was eligible under the Policy). Therefore, Muse cannot prove "coverage under the insurance policy," as required to prove his bad-faith claim against Allianz. *Harris*, 740 F. App'x at 908. Allianz is entitled to summary judgment on this claim.

### D. *Allianz's Motion to Exclude*

Allianz additionally has moved to exclude the testimony and opinion of Defendants' expert Stephen D. Prater or, alternatively, to limit Mr. Prater's testimony at trial. *See* Pl.'s Mot. to Exclude (Doc. No. 100) at 2-11. Muse has filed a Response (Doc. No. 108), to which Allianz has replied (Doc. No. 121).[3] Mr. Prater has been identified by Defendants as an expert on insurance-claim practices and standards, as well as the investigation and evaluation of long-term-care claims. *See* Prater Report (Doc. No. 100-2).

Muse relies upon Mr. Prater's expert report as support for his bad-faith counterclaim and there is no indication from the parties' submissions that Mr. Prater's testimony would be relevant or arguably admissible as to any other claim or counterclaim in this action. *See* Def.'s Resp. at 38-54 (citing Prater Report). Because Allianz is entitled to summary

---

[3] Although both Defendants identified Mr. Prater as an expert witness, only Muse responded to the Motion to Exclude.

judgment on that counterclaim on grounds that do not touch upon Mr. Prater's Report or field of knowledge, Allianz's Motion to Exclude is denied as moot.

*E. Allianz's Motion to Supplement*

After Allianz's Motion for Partial Summary Judgment was fully briefed, Allianz filed a Motion to Supplement (Doc. No. 126), seeking leave to supplement its summary-judgment Motion with certain deposition testimony from Adlife's corporate representative. The Motion to Supplement is not yet at issue but states that Defendants object to the proposed supplementation. *See* Pl.'s Mot. to Suppl. at 3. Because (i) Allianz has shown that it is entitled to summary judgment on the current record as to two claims, and (ii) the proposed deposition testimony does not address any issue material to the third claim, the Court need not consider the supplementation issue as to Allianz's summary-judgment Motion. *See id.* (stating that the testimony is relevant to the declaratory-judgment, fraud-and-deceit, and conspiracy claims, as well as the bad-faith counterclaim, but not citing the breach-of-contract counterclaim).

CONCLUSION

As outlined above, Allianz's Motion for Partial Summary Judgment (Doc. No. 98) is GRANTED IN PART and DENIED IN PART. Specifically:

1. Allianz is entitled to a declaratory judgment that Muse is not entitled to benefits under the Policy for the home-health services performed by Pearson from April 22, 2017, through March 30, 2018;

2. Allianz is entitled to summary judgment on Muse's counterclaim for breach of the implied duty of good faith and fair dealing; and

3. Allianz is not entitled to summary judgment on Muse's counterclaim for breach of contract.

17

Judgment shall be entered for Allianz on the relevant claims at the conclusion of this litigation.

In addition,

4. Allianz's Motion (Doc. No. 100) seeking to exclude the testimony of Defendants' expert Stephen D. Prater is DENIED AS MOOT; and

5. Allianz's Motion to Supplement (Doc. No. 126) is DENIED AS MOOT as to supplementation of Allianz's summary-judgment motion.

The issuance of this decision and of the concurrently issued Order on Defendants' Motion for Partial Summary Judgment (Doc. No. 127) leaves the following claims remaining for trial: (1) Allianz's fraud-and-deceit claim against Muse and Pearson; (2) Allianz's conspiracy claim against Muse and Pearson; and (3) Muse's counterclaim for breach of contract against Allianz.

IT IS SO ORDERED this 18th day of December 2019.

_____
CHARLES B. GOODWIN
United States District Judge