## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| **ALLIANZ LIFE INSURANCE** | ) | |
| **COMPANY OF NORTH AMERICA,** | ) | |
| | ) | |
| **Plaintiff/Counterclaim Defendant,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-17-1361-G** |
| | ) | |
| **GENE L. MUSE, M.D.** | ) | |
| | ) | |
| **Defendant/Counterclaimant.** | ) | |

## ORDER

In December 2017, Allianz Life Insurance Company of North America ("Allianz") filed its Complaint (Doc. No. 1) alleging that a dispute had arisen in connection with a long-term-care insurance policy ("the "Policy") issued in 2000 by Allianz to Gene L. Muse, MD ("Muse"). *See* Compl. ¶¶ 11-41; *id.* Ex. 1 ("Policy") (Doc. No. 1-1). Muse filed several counterclaims. *See* Answer & Countercls. (Doc. No. 9).

The Court granted partial summary judgment to Allianz on aspects of certain claims and a jury trial was held as to the remainder, resulting in a jury verdict in Muse's favor. *See* Order of Dec. 18, 2019 (Doc. No. 128); Verdict (Doc. No. 203). On appeal, the Court of Appeals for the Tenth Circuit reversed in part and affirmed in part the Court's summary judgment ruling, remanding the action for further proceedings. *See* Order & J. (10th Cir. Aug. 26, 2022) (Doc. No. 270) at 34-35; Mandate (Doc. No. 271).

Following remand, the Court permitted the parties to submit additional dispositive motions. Now before the Court is Allianz's Motion for Summary Judgment on Remand, seeking summary judgment in its favor on Allianz's claim for declaratory judgment,

Muse's counterclaim for breach of contract, and Muse's counterclaim for breach of the duty of good faith and fair dealing ("bad faith"), *see* Pl.'s Mot. (Doc. No. 287) at 21-34; and Muse's Motion for Summary Judgment (Doc. No. 288), seeking summary judgment in his favor on Allianz's claim for declaratory judgment and Muse's counterclaim for breach of contract, *see* Def.'s Mot. (Doc. No. 288) at 20-32. The parties have submitted responses, *see* Doc. Nos. 292, 293, and replies, *see* Doc. Nos. 294, 295.

## I.  *Summary Judgment Standards*

Summary judgment is a means of testing in advance of trial whether the available evidence would permit a reasonable jury to find in favor of the party asserting a claim. The Court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A party that moves for summary judgment has the burden of showing that the undisputed material facts require judgment as a matter of law in its favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To defeat summary judgment, the nonmovant need not convince the Court that it will prevail at trial, but it must cite sufficient evidence admissible at trial to allow a reasonable jury to find in the nonmovant's favor—i.e., to show that there is a question of material fact that must be resolved by the jury. *See Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Parties may establish the existence or nonexistence of a material disputed fact by:

- citing to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in the record; or

- demonstrating "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1)(A), (B). While the Court views the evidence and the inferences drawn from the record in the light most favorable to the nonmoving party, *see Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Liberty Lobby*, 477 U.S. at 252.

When, however, the moving party has the burden of proof at trial, "a more stringent summary judgment standard applies." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008). The moving party cannot carry its burden by "pointing to parts of the record that [the movant] believes illustrate the absence of a genuine issue of material fact." *Id.* Rather, to obtain summary judgment on its own claim or defense, a movant "must establish, as a matter of law, all essential elements of the issue before the nonmovant can be obligated to bring forward any specific facts alleged to rebut the movant's case." *Id.*

Regarding cross-motions for summary judgment, the Tenth Circuit has explained:

"The filing of cross-motions for summary judgment does not necessarily concede the absence of a material issue of fact. This must be so because by the filing of a motion a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted." *Nafco Oil & Gas, Inc. v. Appleman*, 380 F.2d 323, 324-25 (10th Cir. 1967). Accordingly, "cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007).

"Even where the parties file cross motions pursuant to Rule 56, summary judgment is inappropriate if disputes remain as to material facts.'"  *Id.*

*Brown v. Perez*, 835 F.3d 1223, 1230 n.3 (10th Cir. 2016) (alteration and citations omitted).

## II.  *Relevant Background*[1]

In December 2017, Allianz filed its Complaint alleging that a dispute had arisen in connection with the Policy issued by Allianz to Muse.  *See* Compl. ¶¶ 11-41; *id.* Ex. 1 ("Policy") (Doc. No. 1-1).   The Policy provides "Daily Benefits" for "Home and Community Services," which include payment for "Home Care" services provided in connection with the activities of daily living—or ADLs—of bathing, continence, dressing, eating, toileting, and transferring.  Policy at 10-11.  The Policy defines "Home Care" as a "program of services provided to you through a Home Health Care Agency, including . . . care by a Home Health Aide."  *Id*. at 11.  "Home Health Aide" is defined as a "person . . . who provides: Maintenance or Personal Care . . . under the supervision of a Home Health Care Agency."  *Id.*

To be eligible for such Daily Benefits, the insured must be certified within the previous 12 months by a licensed health care practitioner as being "Chronically Ill"—i.e., (1) being unable to perform, without "Substantial Assistance," at least two ADLs for a period of at least 90 days due to loss of functional capacity or (2) having a severe "Cognitive Impairment."  *Id*. at 11, 13-14.  "Substantial Assistance" means "hands-on or stand-by assistance of another person without which you would be unable to perform [ADLs]."  *Id.* at 13.

---

[1] Facts relied upon in this Order are uncontroverted or, where genuinely disputed, identified as such and viewed in the light most favorable to the applicable nonmoving party.

The Policy provides Muse with unlimited Daily Benefits for Home and Community Services for the period that Muse meets the criteria set out in the Policy's Eligibility for Benefits provision. *See id.* at 5, 13-14. If eligible for payment of benefits, Muse receives the full Daily Benefit for covered services, "regardless of actual charges incurred" by Muse. *Id.* at 8.

Muse, who previously worked as an orthopedic surgeon, alleges that he suffers from chronic physical ailments, as well as impairments that arose when he fell from a ladder on June 28, 2014. Answer & Countercls. ¶¶ 69-70. Muse filed his first claim for Daily Benefits on July 28, 2015, asserting that he had been paying for home health-care services for "[a]ll daily activities" from AdLife HomeCare LLC ("AdLife," later known as "Alpha Private Services LLC") since September 17, 2014. Pl.'s Ex. 3 (Doc. No. 98-3) at 229-41; *see also* Compl. ¶ 17.

Shortly before filing this first claim, Muse's attorney and Allianz's long-term-care benefits administrator engaged in discussions regarding whether Muse could receive benefits under the Policy for caregiver services provided by an independent provider rather than a Home Health Aide ("HHA"). *See* Pl.'s Ex. 3, at 94-110. The Policy's Alternative Plan of Care Benefit ("APOCB") provision covers "care services not normally covered under the Home and Community Services Benefit" and contemplates coverage for caregiver services provided by an independent provider who is not supervised by a Home Health Care Agency ("HHCA") in some circumstances, subject to Allianz's vetting and approval. *See* Policy at 16; *see also* Trial Tr. 65:24-66:11 (Doc. No. 215). Allianz, through its long-term-care benefits administrator, had previously informed Plaintiff's counsel in

January of 2015 that independent providers were not covered under the Policy and that Muse would need to obtain care through an HHCA.  *See* Pl.'s Reply at 11; Pl.'s Ex. 4 (Doc. No. 98-4) at 4.  Then, in response to an additional inquiry regarding the exclusion of independent providers from coverage, Allianz provided the following written reply dated July 24, 2015:

> [T]he policy limits coverage to eligible expenses incurred for the services of a Home Health Care Agency as defined in the policy.  The Policy does not include a benefit for care provided by an independent care provider.  If Dr. Muse believes there are exceptional circumstances under which he would like us to consider coverage of expenses incurred for the services of an Independent Provider, he should submit a written request with details concerning the circumstances.  As noted in our July 20, 2015 letter, services would be considered under the policy's Alternative Plan of Care Benefit provision.  This policy provision states, "We reserve the right to make the final decision on any request for the Alternative Plan of Care Benefit."

Pl.'s Ex. 3, at 109; *see also* Policy at 16 (containing the quoted language).  Defendant was also provided with instructions and the necessary forms to submit for consideration of benefits for services provided by an independent provider.  *See* Pl.'s Ex. 3, at 94-95.  Muse does not dispute that he never submitted any request regarding caregiver services provided by an independent provider or sought Allianz's approval for benefits under the APOCB provision.  *See* Def.'s Resp. at 32.

Instead, on September 30, 2015,[2] Muse submitted to Allianz: (1) a copy of AdLife's state license; (2) AdLife's care plan for Muse; and (3) itemized invoices and Weekly Documentation Logs from AdLife certifying under penalty of law that Patia Pearson

---

[2] In September of 2015, Allianz retained an investigator to observe and record Muse's activities.  *See* Pl.'s Ex. 11 (Doc. No. 98-11).  The surveillance footage shows Muse ambulating without assistance and driving.  *See* Sept. 2015 Surveillance Footage (filed conventionally).

("Pearson"), then an HHA with AdLife, had provided Muse with identified home-health services every day from July 1, 2015, through September 25, 2015.  Defs.' Ex. 12 (Doc. No. 97-12); Wuensch Dep. 35:5-36:1 (Doc. No. 97-32) (Patty Wuensch testifying in role as Allianz corporate representative); *see also* Compl. ¶ 19; Answer & Countercls. ¶ 19.

On October 29, 2015, a letter from Allianz's long-term-care benefits administrator, issued on Allianz letterhead, notified Muse that he was eligible for Daily Benefits and that Muse's "benefit eligibility period is approved through January 26, 2016 provided [Muse] continue[s] to satisfy the policy's benefit eligibility requirements."  Pl.'s Ex. 3, at 131.  On November 9, 2015, Allianz paid the claim for Daily Benefits of $32,728.53 to Muse for services provided him from July 1, 2015, to September 25, 2015.  Defs.' Ex. 26 (Doc. No. 97-26) at 2-4.  On January 21, 2016, Allianz paid $22,232.84 for Daily Benefits for services provided him from September 26, 2015, through November 22, 2015.  *Id.* at 5-6.

On January 15, 2016, however, Allianz sent a letter to Muse informing him that "because the level of impairment" claimed by Muse—i.e., daily assistance with his ADLs and numerous other tasks—"did not appear to be consistent with medical information," Allianz had conducted an "activities check," the results of which "conflict[ed] with the documented care needs described in the Weekly Documentation Logs."  Def.'s Ex. 4 (Doc. No. 97-4) at 2-3.  The letter concluded, "The activities we have observed suggest that Dr. Muse is capable of performing the Activities of Daily Living without Substantial Assistance of another person.  Consequently, we have concluded that he is not Chronically Ill beginning on November 23, 2015, and no further benefits will be approved for services

received on or after this date." *Id.* at 3.[3]

Muse then appealed this claim denial, submitting a letter from Michael Winzenread, MD, asserting that Muse needed assistance with the ADLs of bathing, dressing, and toileting.  Def.'s Ex. 5 (Doc. No. 97-5); *see also* Compl. ¶ 24.  Allianz then advised Muse that it would be seeking medical records from Dr. Winzenread and requesting an in-home nursing assessment by a nurse care manager.  Def.'s Ex. 6 (Doc. No. 97-6).  The in-home assessment was conducted on or about July 20, 2016.  Compl. ¶ 25.  Muse and Pearson both participated in the assessment and asserted that Muse required assistance from Pearson with bathing, continence, dressing, eating, toileting, and transferring.  *Id.*; *see also* Answer & Countercls. ¶ 25.  On August 18, 2016, Allianz upheld its prior denial of benefits for services post November 22, 2015.  Def.'s Ex. 8 (Doc. No. 97-8).

Muse appealed this decision, submitting additional materials for review on October 26, 2016.  Def.'s Ex. 9 (Doc. No. 97-9).[4]  On March 3, 2017, Allianz notified Muse that it had reconsidered and would pay the claims submitted for Daily Benefits rendered from November 23, 2015, through January 1, 2016.  Def.'s Ex. 10 (Doc. No. 97-10).  On March 10, 2017, Allianz paid Daily Benefits of $15,800.00 to Muse for services provided to him during that period.  Def.'s Ex. 26, at 26-27.

---

[3] In late November of 2015, Allianz again retained an investigator to observe and record Muse's activities. *See* Pl.'s Ex. 12 (Doc. No. 98-12).  The surveillance footage shows Muse ambulating without assistance and using a key to open and close a vehicle door.  *See* Nov. 2015 Surveillance Footage (filed conventionally).

[4] In mid-March 2017, Allianz again retained an investigator to observe and record Muse. *See* Pl.'s Ex. 13 (Doc. No. 98-13).  The investigator recorded Muse at an event ambulating, sitting, and standing without assistance; carrying a cane but not using it; lifting a chair with one hand; picking up a paper and writing on it with a pen; and carrying a box under his arm.  *See id.*; Mar. 2017 Surveillance Footage (filed conventionally).

Muse continued to submit claims with invoices and documentation logs showing home-health services provided by Pearson during 2016 and 2017.  Def.'s Exs. 18, 19, 20 (Doc. Nos. 97-18, 97-19, 97-20).  On April 19, 2017, Allianz paid Daily Benefits of $83,740.00 to Muse for services provided to him from January 2, 2016, through July 31, 2016.  Def.'s Ex. 26, at 28-29.  On May 5, 2017, Allianz paid $75,741.25 of Daily Benefits to Muse for services provided to him from August 1, 2016, through February 3, 2017.  *Id.* at 30-31.  On June 13, 2017, Allianz paid $31,935.75 of Daily Benefits to Muse for services provided to him from February 4, 2017, through April 21, 2017.  *Id.* at 32-33.

In May of 2017, one of Muse's treating physicians, Dr. Housang Seradge, completed a "Chronically Ill Statement" for Allianz.  *See* Pl.'s Ex. 5 (Doc. No. 98-5) at 2-4.  Dr. Seradge stated that Muse was able to independently perform the ADLs of ambulation, eating, and transferring, and that Dr. Seradge did not know if Muse required assistance for bathing, continence, dressing, and toileting.  *Id.*  Thus, Dr. Seradge was not able to and did not certify Muse as Chronically Ill.  *See id.* at 4.  On June 29, 2017, Allianz informed Muse it would not approve benefits beyond April 21, 2017, because Muse no longer met the Policy's definition of Chronically Ill.  Def.'s Ex. 25 (Doc. No. 97-25) at 1 ("Based on information on file, we are unable to determine Dr. Muse requires assistance with at least two ADLs at this time . . . .").

Muse then submitted more documentation and invoices for payment of claims beyond April 21, 2017.  *See* Def.'s Ex. 22 (Doc. No. 97-22).  On July 11, 2017, Muse requested reconsideration of Allianz's denial and submitted a Chronically Ill Statement from a physician who certified that Muse needed stand-by assistance with two ADLs and

hands-on assistance with five ADLs.  *See* Def.'s Ex. 27 (Doc. No. 97-27); Def.'s Ex. 34 (Doc. No. 97-34).  On September 5, 2017, Allianz received logs and invoices for services rendered through September 2, 2017.  *See* Def.'s Ex. 23 (Doc. No. 97-23).  Allianz and Muse's attorney continued to correspond regarding Allianz's ongoing review of the claims for Daily Benefits.  Def.'s Exs. 28, 29, 30 (Doc. Nos. 97-28, 97-29, 97-30).

In November 2017, Allianz provided the medical records submitted by Muse and gathered by Allianz, as well as video recordings taken by Allianz's investigator, to Stephen K. Holland, MD, for review.  Compl. ¶ 39.  Dr. Holland is the Medical Director and Chief Medical Officer of LTCG, a third party hired by Allianz to administer long-term-care-insurance claims.  *See* Def.'s Ex. 35 (Doc. No. 97-35) at 3-4.  Dr. Holland issued a report on November 10, 2017, stating that he was not able to certify Muse as a Chronically Ill individual under the Policy.  Dr. Holland also opined that Muse had regained his ability to perform ADLS no later than September 21, 2016.  *See* Holland R. (Doc. No. 98-6).

Pearson had been Muse's primary caregiver since 2014, although Muse had also received some limited assistance from family members.  *See* Muse Dep. 93:12-96:11 (Doc. No. 111-1).[5]  Pearson began staying at Muse's home on a regular basis soon after Muse suffered his fall in June 2014.  *Id.* at 90:3-6.  Pearson was already providing care services for Muse when she became employed by AdLife.  *Id.* at 169:4-9; Pearson Dep. (Doc. No. 111-2) at 94:24-95:3.  During the time period from Muse's accident in 2014 until Pearson

---

[5] Pearson and Muse had a romantic relationship from 2001 through 2007 and intermittently after that for a couple of years.  They considered themselves to be each other's significant other at various times.  During 2008 through 2014, although Pearson dated other people, she still attended events with Muse and occasionally stayed at his home.  Pearson Dep. 35:9-36:1; 36:20-37:11, 38:16-40:4 (Doc. No. 111-2).

became employed by AdLife in July 2015, Muse was not paying Pearson for the caregiver services that she was providing.  Muse Dep. (Doc. No. 111-1) at 172:13-20; *see also* Pearson Dep. (Doc. No. 98-2) at 17:23-18:2 (Pearson testifying that they had a verbal agreement that she would be paid "at some point").

On January 1, 2016, Pearson's status with AdLife changed from that of employee to independent contractor.  *See* Indep. Cont'r Agrmts. (Doc. No. 122-3) at 2-4.  Pearson's contract with AdLife provided that AdLife would hire Pearson as an independent contractor, that Pearson's compensation would be paid by AdLife "once [Muse's] insurance company reimburses [Muse]" for Pearson's services and Muse pays AdLife, and that if Muse did not pay AdLife then Muse himself was responsible for Pearson's compensation.  *Id.* at 2-3, 5-6.[6]

The contract further provided that "[AdLife] shall not direct, supervise, or control, or be responsible for the supervision, direction, or control of the Home Health Aide while said Home Health Aide is performing the nursing services as per this agreement."  *Id.* at 6. Pearson testified at trial, however, that even after her status with AdLife changed from employee to independent contractor, she was still supervised by AdLife.  *See* Trial Tr. 789:17-790:21, 803:22-804:03 (Doc. No. 215-4) ("[T]hey did supervise my work.  I still called them if I needed help. . . . I still sent them my daily time sheets, they still Q-and-A'd them, did a quality assurance.  So it was supervision for me.  I still called them if I needed them, you know, or had any questions.").

---

[6] Muse was not a party to this contract.  *See* Indep. Cont'r Agrmts. at 4, 7.

Although Pearson did not terminate her relationship with AdLife until January 2018, Muse paid AdLife only for services provided by Pearson through April 21, 2017, which is the last date of Pearson's services for which Allianz paid Daily Benefits to Muse. Payment Chart (Doc. No. 122-2) at 2; Checks (Doc. No. 112-3) at 2-15; Muse Dep. 221:9-19 (Doc. No. 112-4); Pearson Dep. 19:14-15 (Doc. No. 112-2).[7] Pearson was not paid for caregiver services provided to Muse from April 22, 2017, through December 31, 2017—i.e., during the period for which Allianz denied benefits and did not issue a check to Muse—by either Muse or AdLife until 2019. Payment Chart at 2; Checks at 2-15; Muse Dep. 221:9-19 (Doc. No. 112-4); Doc. No. 280-1.

After Pearson stopped working for AdLife in January 2018, Muse began paying her $3000 per month directly. Pearson Dep. 19:14-15, 19:24-20-3 (Doc. No. 112-2); Muse Dep. 92:5-93:7, 181:13-17 (Doc. No. 98-1); Checks at 16-22; Doc. No. 280-1.[8] Muse has submitted requests to Allianz for Daily Benefits for services rendered by Pearson through March 30, 2018. Pl.'s Ex. 9 (Doc. No. 98-9) at 62-65, 66-113.

### III. Discussion

Allianz seeks summary judgment on remand as to its claim for declaratory

---

[7] Muse's contract with AdLife provided that AdLife's invoices "shall be due and payable" "when [Muse] receives [a] check from [the] insurance company." Live-In Serv. Agrmt. (Doc. No. 122-5) at 2, 3.

[8] Allianz represents that after the Court initially entered summary judgment in this matter, Muse produced copies of checks, each issued in 2019, paying Pearson directly for caregiver services provided from April 22 to December 31, 2017. *See* Doc. No. 280-1; Pl.'s Mot. at 20-21; *see also* Def.'s Mot. at 19; Def.'s Resp. at 7 ("Admitted that 19 months after Allianz filed its Complaint suing Dr. Muse and Pearson for fraud and conspiracy and over two years after Allianz had paid any benefits for caregiver services – Muse paid Pearson for services she provided from April 22 to December 31, 2017.").

judgment, Muse's counterclaim for breach of contract, and Muse's counterclaim for bad faith. *See* Pl.'s Mot. at 21-34. Muse argues that he is entitled to summary judgment in his favor on his breach of contract counterclaim and Allianz's claim for declaratory judgment. *See* Def.'s Mot. at 20-32; Def.'s Resp. at 25-35. Muse further asserts that there is a genuine dispute of material facts precluding summary judgment as to his counterclaim for bad faith. *See* Def.'s Resp. at 35-49. The Court considers each claim and counterclaim in turn.

A.   *Allianz's Claim for Declaratory Judgment*

1.   <u>Whether Allianz Is Entitled to Summary Judgment on Its Claim for Declaratory Judgment Relating to the Period of April 22, 2017, Through December 31, 2017</u>

Allianz first seeks summary judgment on its claim for a declaratory judgment that Muse is not entitled to benefits under the Policy for caregiver services provided from April 22, 2017, through December 31, 2017. *See* Pl.'s Mot. at 21-22. The Court previously entered summary judgment in favor of Allianz on certain aspects of its claim for declaratory judgment, finding that no benefits were owed under the Policy with regard to certain discrete time periods. Specifically, as relevant here, the Court ruled that no benefits were owed: (1) from April 22 to December 31, 2017, because Muse had no financial liability for the caregiver services provided by Pearson and thus no benefits were payable due to the Policy's financial liability exclusion; and (2) from January 1 to March 30, 2018, because Pearson was not working for an HHCA during that time, and so the services that she allegedly provided were not covered under the Policy. *See* First Summ. J. Order (Doc. No. 128) at 11-13.

The Tenth Circuit reversed and remanded this Court's determination regarding the period of April 22 to December 31, 2017, holding that due to the Policy's Indemnity

Benefit Rider, Muse did not have to incur any financial liability for caregiver services in order for coverage to exist under the Policy. *See* Order & J. at 10-20; *see also* Policy at 47. The appellate court affirmed, however, this Court's ruling that Muse was not entitled to coverage under the Policy from January to March of 2018 because Pearson was not working for an HHCA during that period. *See* Order & J. at 20-23.

On remand, Allianz contends that the same circumstances that were held by the Tenth Circuit to require summary judgment in Allianz's favor as to the January-March 2018 period also were present during the April-December 2017 period. Allianz contends that, between April 22, 2017, and December 31, 2017, Pearson was an independent contractor whose work AdLife did not direct, supervise, or control, as evidenced by Pearson and AdLife's Independent Contractor Agreement. *See* Pl.'s Mot. at 22; Indep. Cont'r Agrmt. at 2-3, 5-6. Allianz argues that instead Pearson was directly employed and paid by Muse for services provided during this period. *See* Pl.'s Mot. at 22.

Muse responds that the record, more fully developed at trial, demonstrates that there is at least a genuine dispute of material fact as to whether Pearson was supervised by an HHCA during the relevant time period. *See* Def.'s Resp. at 29-33. Muse points out that while the Policy's definition for an HHA requires the caregiver to provide services "under the supervision" of an HHCA, it does not require any particular level of supervision. *See* Policy at 11; Def.'s Resp. at 30. Muse also points out that the Policy does not require the HHA to be employed and paid by an HHCA; it only requires that the HHA be licensed under state law and supervised by an HHCA. *See* Policy at 11.

14

The Policy's general provisions only cover services provided through an HHCA, including by an HHA who provides care under the supervision of a licensed HHCA. *See* Policy at 11 (defining "Home Care" as a "program of services provided to you through a Home Health Care Agency" and "Home Health Aide" as a "person . . . who provides: Maintenance or Personal Care . . . under the supervision of a Home Health Care Agency"); *see also* Pl.'s Mot. at 22; Def.'s Resp. at 30.  Allianz is correct that the Independent Contractor Agreement is significant evidence that Pearson was not supervised by AdLife, the HHCA with which she was affiliated.  Pearson testified at trial, however, that even after her status with AdLife changed from employee to independent contractor, she was still supervised by AdLife.  *See* Trial Tr. 789:17-790:21, 803:22-804:03 (Doc. No. 215-4) ("[T]hey did supervise my work.  I still called them if I needed help. . . . I still sent them my daily time sheets, they still Q-and-A'd them, did a quality assurance.  So it was supervision for me.  I still called them if I needed them, you know, or had any questions.").

Viewing the facts in the light most favorable to Muse as the nonmovant, the record in this case presents a genuine dispute of material fact regarding whether Pearson was supervised by AdLife from April 22, 2017, through December 31, 2017 within the meaning of the Policy provisions and coverage.  This factual dispute directly affects Muse's entitlement to benefits during this period and so precludes a summary-judgment ruling in favor of Allianz as to this aspect of Allianz's claim for declaratory judgment.

2.     Whether Muse Is Entitled to Summary Judgment on Allianz's Claim for Declaratory Judgment Relating to the Period of April 22, 2017, through December 31, 2017

Muse in turn moves for summary judgment in his favor on this aspect of Allianz's claim for declaratory judgment.  Specifically, Muse argues that the Court has already found that the jury "implicitly decided" that Pearson was supervised by an HHCA at trial.  *See* Def.'s Mot. at 29-31.

The jury's verdict in favor of Muse on Allianz's fraud and deceit claim does not reflect on its face, and did not require an underlying finding, that Pearson was supervised by an HHCA.  *See* Verdict at 1; *see also* Jury Instr. (Doc. No. 201) at 12-15.  Further, the prior Order of this Court referenced by Muse recognized only that "a jury *could reasonably infer* from the totality of the evidence that AdLife supervised the caregiver services Pearson provided to Muse."  See Order of Oct. 26, 2020 (Doc. No. 249) at 8-11 (emphasis added).  That statement, if anything, only reinforces the existence of a genuine factual dispute regarding Pearson's supervision by an HHCA that precludes entry of summary judgment as to either party on this aspect of Allianz's claim for declaratory judgment.

Muse alternatively argues that it does not matter whether Pearson was supervised by an HHCA during this period because he is still entitled to benefits under the Policy's APOCB provision, which covers "care services not normally covered under the Home and Community Services Benefit."  *See* Def.'s Resp. at 30; *see also* Policy at 16.  As noted, the APOCB provision contemplates care services provided by an independent provider who is not supervised by an HHCA in some circumstances, subject to Allianz's vetting and approval.  *See* Policy at 16; *see also* Trial Tr. 65:24-66:11 (Doc. No. 215).

Allianz informed Plaintiff's counsel in January of 2015 that independent providers were not covered under the Policy and Muse would need to obtain care through an HHCA. *See* Pl.'s Reply at 11; Pl.'s Ex. 4, at 4.  Later, in response to Muse's inquiry, Allianz provided the following written reply:

> [T]he policy limits coverage to eligible expenses incurred for the services of a Home Health Care Agency as defined in the policy.  The Policy does not include a benefit for care provided by an independent care provider.  If Dr. Muse believes there are exceptional circumstances under which he would like us to consider coverage of expenses incurred for the services of an Independent Provider, he should submit a written request with details concerning the circumstances.  As noted in our July 20, 2015 letter, services would be considered under the policy's Alternative Plan of Care Benefit provision.  This policy provision states, "We reserve the right to make the final decision on any request for the Alternative Plan of Care Benefit."

Pl.'s Ex. 3, at 109; *see also* Policy at 16 (containing the quoted language).  Defendant was also provided with instructions and the necessary forms to submit for consideration of benefits for caregiver services provided by an independent provider.  *See* Pl.'s Ex. 3, at 94-95.

Muse does not dispute that he never submitted any such written request regarding expenses incurred by an independent provider or sought Allianz's approval for coverage under the APOCB provision.  *See* Def.'s Resp. at 32.  Muse may not now claim that he is entitled to benefits on this basis.  *See Garrett v. Fairfield Ins. Co.*, No. 02-367, 2003 WL 23274567, at *8 (E.D. Okla. Oct. 22, 2003) (holding that the plaintiff had not established a valid claim under the policy when he did not comply with contractual requirements for submission of the claim); *see also Mabrey Bancorporation v. Everest Nat'l Ins. Co.*, No. 4:19-CV-00571, 2022 WL 1410715, at *11 (N.D. Okla. May 4, 2022) (finding that insurer had no duty to indemnify when insured failed to satisfy a condition precedent to coverage).

For these reasons, Muse's Motion for Summary Judgment is denied to the extent that it seeks entry of summary judgment as to this aspect of Allianz's declaratory judgment claim.[9]

B.    *Muse's Breach of Contract Counterclaim*

1.    <u>Whether Allianz Is Entitled to Summary Judgment as to Muse's Breach of Contract Counterclaim</u>

Allianz argues that Muse's counterclaim for breach of contract fails as a matter of law.  *See* Pl.'s Mot. at 23.  To recover under a breach of contract theory, Muse must establish three elements: "(1) formation of a contract; (2) breach of the contract; and (3) damages as a direct result of the breach."  *See Digit. Design Grp., Inc. v. Info. Builders, Inc.*, 24 P.3d 834, 843 (Okla. 2001).

Allianz argues that Muse cannot establish the second element—breach.  *See* Pl.'s Mot. at 23.  Muse alleges Allianz breached the Policy by its "refusal to authorize and pay the insurance benefits."  *See* Answer & Countercls. ¶ 137.

As Allianz points out, the Tenth Circuit's decision remands for further proceedings as to whether Allianz breached the Policy by denying benefits to Muse relating to the period of April 22 to December 31, 2017.  *See* Order & J. at 10-23.  As to that period, Allianz incorporates by reference its argument regarding its claim for declaratory judgment— that

---

[9] To the extent that Muse argues that he is entitled to summary judgment on Allianz's declaratory judgment claim because he met the Policy's definition of Chronically Ill during the relevant time period, *see* Def.'s Mot. at 27-32, this argument is unavailing.  Allianz is seeking a declaratory judgment that it owes no benefits to Muse from April 22, 2017, to December 31, 2017, solely on the basis that the alleged caregiver services were not provided through an HHCA.  *See* Pl.'s Mot. at 21-23.

from April 22, 2017, through December 31, 2017, Pearson was not an HHA supervised by an HHCA and, so, no benefits are due for that time period.  *See* Pl.'s Mot. at 23.

As explained above, the Court determines that relevant to the period of April 22, 2017, through December 31, 2017, the record in this case contains evidence from which a reasonable jury could find that Pearson was supervised by AdLife, meaning that Muse received covered services during this period and is owed benefits under the Policy. Consequently, Allianz has not shown that it is entitled to summary judgment as to this aspect of Muse's counterclaim for breach of contract.

2.  <u>Whether Muse Is Entitled to Summary Judgment as to His Breach of Contract Counterclaim</u>

Muse in turn argues that he is entitled to summary judgment as to his breach of contract counterclaim.  *See* Def.'s Mot. at 20-27.  The same genuine dispute of material fact previously discussed also precludes an award of summary judgment to Muse.  The trier of fact must resolve the discrepancy between the Independent Contractor Agreement, wherein AdLife and Pearson agreed that Pearson would not be subject to supervision by AdLife, and Pearson's subsequent trial testimony that she was supervised by AdLife as an independent contractor.  *See Duffee By & Through Thornton v. Murray Ohio Mfg. Co.*, 160 F.R.D. 602, 604 (D. Kan. 1995) ("A summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences.").

While this Court has previously observed that "a jury could reasonably infer from the totality of the evidence that AdLife supervised the caregiver services Pearson provided to Muse," Order of Oct. 26, 2020, at 8, a jury could also reasonably infer the opposite,

19

which would preclude coverage under the Policy during the relevant time period. Accordingly, Muse's Motion for Summary Judgment is denied as it relates to his counterclaim for breach of contract.[10]

### C.    Muse's Bad-Faith Counterclaim

Finally, Allianz argues that it is entitled to summary judgment as to Muse's bad-faith counterclaim because there were at least three legitimate reasons for Allianz to conclude that Muse was not entitled to benefits under the Policy: (1) because Pearson was only an independent contractor, there were no covered services provided by an HHA supervised by an HHCA; (2) the financial-liability exclusion precluded benefits in light of Muse's at-best conditional agreement to pay Pearson; and (3) the evidence collected by Allianz reflected a legitimate dispute as to whether Muse was chronically ill.  *See* Pl.'s Mot. at 23-36.

The Court begins (and ends) its analysis with Allianz's third argument.

### 1.    Standard Governing Bad-Faith Insurance Claims Under Oklahoma Law

"Under Oklahoma law, '[e]very contract . . . contains an implied duty of good faith and fair dealing.'"  *Combs v. Shelter Mut. Ins. Co.*, 551 F.3d 991, 998-99 (10th Cir. 2008) (alteration and omission in original) (quoting *Wathor v. Mut. Assurance Adm'rs, Inc.*, 87 P.3d 559, 561 (Okla. 2004)).

---

[10] Muse also contends that he is entitled to summary judgment on his breach of contract counterclaim because Allianz owed him benefits under the Policy's APOCB provision. *See* Def.'s Mot. at 21-22, 27-27.  As previously explained, the APOCB provision provided coverage in certain situations for caregiver services provided by an independent provider, subject to Allianz's vetting and approval.  *See* Pl.'s Ex. 3, at 109; *see also* Policy at 16. Muse never sought Allianz's approval for benefits under the APOCB provision and may not now claim that he was entitled to coverage on this basis.

To state a claim of bad faith against an insurer under Oklahoma law, the claimant must plead the following elements: (1) he was covered under the insurance policy and the insurer was required to take reasonable actions in handling the claim; (2) the insurer's actions were unreasonable under the circumstances; (3) the insurer failed to deal fairly and in good faith toward the insured in the handling of the claim; and (4) the breach of the duty of good faith and fair dealing was the direct cause of any damages sustained by the insured.

*Mass. Bay Ins. Co. v. Langager*, No. 16-CV-685, 2017 WL 3586862, at *2 (N.D. Okla. Aug. 18, 2017) (citing *Edens v. The Neth. Ins. Co.*, 834 F.3d 1116, 1128 (10th Cir. 2016)). "The essence of an action for breach of the duty of good faith and fair dealing is the insurer's unreasonable, bad-faith conduct[,] and if there is conflicting evidence from which different inferences may be drawn regarding the reasonableness of insurer's conduct, then what is reasonable is always a question to be determined by the trier of fact by a consideration of the circumstances in each case." *Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080, 1093 (Okla. 2005) (omission and internal quotation marks omitted).

Further, "a claim must be promptly paid unless the insurer has a reasonable belief the claim is either legally or factually insufficient." *Shotts v. GEICO Gen. Ins. Co.*, 943 F.3d 1304, 1316 (10th Cir. 2019) (internal quotation marks omitted). "An insurer does not breach its implied duty to deal fairly and act in good faith with its insured merely by refusing to pay a claim or by litigating a dispute with its insured, so long as there is a legitimate dispute as to coverage or the amount of the claim, and the insurer's position is reasonable and legitimate." *K2 Groceries, Inc. v. Emps. Mut. Cas. Co.*, No. CIV-14-1235-HE, 2015 WL 1015325, at *2 (W.D. Okla. Mar. 9, 2015). The Oklahoma Supreme Court has recognized that there may be legitimate disagreement between insurer and insured "on a variety of matters such as insurable interest, extent of coverage, cause of loss, amount of

loss, or breach of policy conditions," and "[r]esort to a judicial forum is not per se bad faith or unfair dealing on the part of the insurer regardless of the outcome of the suit." *Christian v. Am. Home Assurance Co.*, 577 P.2d 899, 905 (Okla. 1977).

Therefore, "[t]he decisive question is whether the insurer had a good faith belief, at the time its performance was requested, that it had justifiable reason for withholding payment under the policy." *Buzzard v. Farmers Ins. Co.*, 824 P.2d 1105, 1109 (Okla. 1991) (emphasis and internal quotation marks omitted). "The fact that a reasonable jury could find in favor of the insurer based on all facts known or that should have been known by the insurer when it denied a claim is strong evidence that a dispute is 'legitimate.'" *Shotts*, 943 F.3d at 1316 (alteration and internal quotation marks omitted).

Accordingly, the analysis of a bad-faith claim under Oklahoma law occurs in two parts. *See id.* at 1315. First, "the court considers whether there is a legitimate dispute between the insurer and the insured regarding coverage or the value of the claim." *Id.* ("[T]he denial of a claim based upon a legitimate dispute does not imply bad faith." (internal quotation marks omitted)). Then, if there is a legitimate dispute, the court "considers whether the plaintiff offered specific additional evidence to demonstrate bad faith." *Id.* Absent production of such evidence of bad faith, "judgment as a matter of law is to be granted to the insurer." *Id.* (internal quotation marks omitted).

        2.   <u>Whether a Legitimate Dispute Existed Regarding Muse's Status as Chronically Ill During the Relevant Time Period</u>

Allianz argues that there is a legitimate dispute as to whether Muse met the Policy's definition of Chronically Ill from April 22, 2017, through December 31, 2017. *See* Pl.'s Mot. at 27-31. Allianz's denial of benefits for this period followed a Chronically Ill

Statement dated May 5, 2017, in which Muse's treating physician, Dr. Seradge, was not able to and did not certify Muse as Chronically Ill.  *See* Pl.'s Ex. 5, at 4.  Additionally, in November 2017, a physician hired by and who worked frequently with Allianz, Dr. Holland, reviewed medical records submitted by Muse and gathered by Allianz, as well as the surveillance footage taken by Allianz's investigator, which showed Muse ambulating, driving, and performing other motor functions without assistance.  Compl. ¶ 39; *see also* Sept. 2015 Surveillance Footage; Nov. 2015 Surveillance Footage; Mar. 2017 Surveillance Footage.  Dr. Holland issued a report on November 10, 2017, stating that he was not able to certify Muse as a Chronically Ill individual under the Policy and opining that Muse had regained his ability to perform ADLs no later than September 21, 2016.  *See* Holland R.

In his Response, Muse points to evaluations by other medical providers, including a certification that Muse was Chronically Ill within the meaning of the Policy and, further, asserts that Dr. Holland was "biased."  Def.'s Resp. at 44-48.

Viewing the evidence in the light most favorable to Muse on this issue, the Court concludes that there was a legitimate dispute regarding whether Muse met the Policy's definition of Chronically Ill during the relevant time period.  Specifically, based on the information available to Allianz at the time that Muse requested coverage, it can be reasonably inferred that Allianz had a good-faith belief that Muse did not meet the Policy's definition of Chronically Ill and so had a justifiable reason for withholding payment under the Policy notwithstanding conflicting evidence regarding Muse's ability to perform ADLs without assistance.  *See Buzzard*, 824 P.2d at 1109; *Sellman v. AMEX Assurance Co.*, 274 F. App'x 655, 659 (10th Cir. 2008) (finding that the insurer had a right to resist payment

because there was a legitimate dispute as to the cause of the insured's pain based on conflicting medical records); *Haltom v. Great Nw. Ins. Co.*, 460 F. App'x 751, 757-58 (10th Cir. 2012) (affirming summary judgment to insurer on bad-faith claim upon finding that, based on conflicting medical information, a legitimate and reasonable dispute existed as to whether the insured's car accident caused her injury).

        3.   <u>Whether Muse Has Offered Specific Additional Evidence of Bad Faith</u>

Having concluded there was "a legitimate dispute between the parties," the Court "proceeds to the second step of its analysis and considers whether [Muse] [has] offered specific additional evidence to demonstrate bad faith." *Shotts*, 943 F.3d at 1315 (emphasis omitted).

> The additional evidence required for this showing may take several forms. For example, a [claimant] may demonstrate bad faith by providing evidence that the insurer did not *actually* rely on the legitimate dispute to deny coverage, denied the claim for an illegitimate reason, or otherwise failed to treat the insured fairly. A [claimant] may also show bad faith by providing evidence that the insurer performed an inadequate investigation of the claim.

*Id.* (alterations, citations, and internal quotation marks omitted). "To successfully rebut an insurer's defense of having a legitimate dispute as to coverage, 'the insured must present evidence from which a reasonable jury could conclude that the insurer did *not* have a reasonable good faith belief for withholding payment of the insured's claim.'" *Sellman*, 274 F. App'x at 658 (quoting *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1436 (10th Cir. 1993)). "In other words, 'judgment as a matter of law is to be granted to the insurer

when the [claimant] *fails* to produce specific evidence of bad faith.'" *Id.* (quoting *Oulds*, 6 F.3d at 1442).[11]

To begin, Muse argues that "Allianz did not investigate Muse's claim with an eye towards payment but rather towards denial." Def.'s Resp. at 46. Muse does not contend that Allianz's investigation was inadequate; instead, he seems to suggest that Allianz was inordinately focused on Muse and overly thorough in investigating Muse's claim, including by obtaining video surveillance of Muse, requesting additional supporting documentation, and second-guessing Muse's status as Chronically Ill. *See id.* at 39-42, 45-48. The decision to vigorously investigate whether an insured qualifies for benefits is not bad faith in and of itself. Here, the Court has already concluded that Allianz's skepticism regarding Muse's status as Chronically Ill was reasonable. Accordingly, the Court finds that Allianz's actions during its investigation do not constitute additional specific evidence of bad faith even construing the evidence in the light most favorable to Muse as the nonmovant.

Muse further argues that when Allianz denied him coverage with regard to the time period at issue here, Allianz used a "self-serving" opinion—i.e., Dr. Holland's Report—to bolster its denial and ignored evidence favorable to Muse. *See id.* at 43, 46. Again, the Court has determined that there was a legitimate dispute regarding whether Muse was

---

[11] In assessing whether there was a legitimate dispute between the insurer and the insured regarding coverage, the Court's focus is on whether there was a legitimate dispute that Muse met the Policy's definition of Chronically Ill during the relevant period of April 22, 2017, through December 31, 2017. In assessing whether Muse has offered specific additional evidence to demonstrate bad faith, however, the Court considers conduct by Allianz occurring outside the April-December 2017 period that nevertheless tends to show that Allianz's decision to deny Muse benefits for the April-December 2017 period was taken in bad faith.

Chronically Ill from April 22, 2017, through December 31, 2017.  Muse does not offer any evidence supporting the argument that Allianz did not actually rely on this legitimate dispute to deny coverage during the relevant period.  The fact that Muse disagrees with Allianz's determination, and has provided evidence supporting that he was Chronically Ill, does not undermine the legitimacy of Allianz's position.

With regard to Muse's argument that Allianz did not comply with industry standards and its own Policy by failing to explain the reasoning for its denial in sufficient detail quickly enough, *see id.* at 44, 46-47, Muse only provides conclusory assertions, unsupported by summary-judgment evidence.  Further, the record contains correspondence from Allianz to Muse dated June 29, 2017, explaining that Allianz would not approve benefits beyond April 21, 2017, because in Allianz's view Muse no longer met the Policy's definition of Chronically Ill.  *See* Def.'s Ex. 25 ("Based on information on file, we are unable to determine Dr. Muse requires assistance with at least two ADLs at this time . . . ."). And while Muse's appeal regarding denial of coverage during the relevant period was not formally resolved prior to the initiation of this lawsuit, *see* Def.'s Resp. at 43, the Court does not find this fact, taken alone, to be indicative of bad faith by Allianz considering that Allianz continued to investigate Muse's claim after the appeal and then ultimately elected to file this civil action.  And on that point, the Court does not consider Allianz's decision to file this lawsuit to be evidence of a bad-faith denial of Muse's claim.  Contrary to Muse's suggestion, litigation conduct generally cannot be considered as evidence of bad faith under Oklahoma law.  *See Timberlake Constr. Co. v. U.S. Fid. & Guar. Co.*, 71 F.3d 335, 341 (10th Cir. 1995).

For these reasons, viewing the facts in the light most favorable to Muse, Muse has not "offered specific additional evidence to demonstrate bad faith." *Shotts*, 943 F.3d at 1315. Specifically, Muse has not presented evidence demonstrating the existence of a genuine dispute as to whether Allianz acted unreasonably or in bad faith when denying coverage for the relevant time period. Allianz is therefore entitled to judgment as a matter of law as to Muse's bad-faith counterclaim.

## CONCLUSION

For the reasons stated herein, Allianz's Motion for Summary Judgment on Remand (Doc. No. 287) is GRANTED IN PART and DENIED IN PART as follows:

1. Allianz is not entitled to summary judgment on the relevant aspect of its declaratory judgment claim;

2. Allianz is not entitled to summary judgment on the relevant aspect of Defendant Muse's breach of contract counterclaim; and

3. Allianz is entitled to summary judgment on Defendant Muse's counterclaim for breach of the duty of good faith and fair dealing.

IT IS FURTHER ORDERED that Defendant Muse 's Motion for Summary Judgment (Doc. No. 288) is DENIED.

Judgment shall be entered for Allianz on the relevant counterclaim at the conclusion of this litigation.

IT IS SO ORDERED this 30th day of September, 2024.

CHARLES B. GOODWIN
United States District Judge